FILED

09/05/2017

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 16-0429

DA 16-0429

IN THE SUPREME COURT OF THE STATE OF MONTANA

2017 MT 222

BITTERROOTERS FOR PLANNING, INC., and
BITTERROOT RIVER PROTECTIVE ASSOCIATION, INC.

Plaintiffs and Appellees,

v.

MONTANA DEPARTMENT OF ENVIRONMENTAL
QUALITY, an agency of the State of Montana,

Defendant and Appellant,

STEPHEN WANDERER and GEORGIA FILCHER,

Defendants, Intervenors and Appellants.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. ADV 15-32
Honorable Mike Menahan, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Alan F. McCormick (argued), Stephen R. Brown, Garlington, Lohn,
Robinson, Missoula, Montana

Edward Hayes (argued), Kirsten H. Bowers, Special Assistant
Attorneys General, Helena, Montana

For Appellees:

Jack R. Tuholske (argued), Tuholske Law Office, P.C., Missoula,
Montana

David K. W. Wilson, Jr., Morrison, Sherwood, Wilson, & Deola, Helena,
Montana

For Amicus:

  Derf L. Johnson, Montana Environmental Information Center,
  Helena, Montana

---

  Argued and Submitted: March 29, 2017
             Decided: September 5, 2017

Filed:

_____
                  Clerk

2

Justice Dirk Sandefur delivered the Opinion of the Court.

¶1      The Montana Department of Environmental Quality (DEQ) appeals from an order

of the Montana First Judicial District Court granting summary judgment to Bitterrooters

for Planning, Inc., and Bitterroot River Protective Association, Inc., (collectively

Bitterrooters) that DEQ violated the Montana Environmental Policy Act[1] (MEPA) by

issuing a wastewater discharge permit for an unnamed "big box" retail merchandise store

near Hamilton, Montana, without considering environmental impacts of the construction

and operation of the facility other than water quality impacts and impacts of the

construction of the required wastewater treatment system.  Intervenors and current owners

of the site, Stephen Wanderer and Georgia Filcher (Landowners), join that appeal and

further appeal the District Court's related summary judgment that MEPA requires DEQ to

identify the owner or operator of the contemplated retail store.  We reverse, in part, and

affirm, in part.

## ISSUES

1. *Does MEPA require DEQ to consider non-water quality related environmental impacts of the construction and operation of a retail store facility as secondary impacts of the issuance of a Montana Water Quality Act (MWQA) permit to discharge facility wastewater into the ground from an onsite wastewater treatment system?*

2. *Does MEPA require DEQ to identify the actual owner or operator of a wastewater treatment facility prior to issuing a MWQA groundwater discharge permit?*

---

[1] Title 75, Chapters 1-3, MCA.

**BACKGROUND**

¶2    On April 3, 2014, DEQ received an application for a Montana groundwater pollution control system (MGWPCS) permit[2] to discharge Level 2 wastewater[3] into Class 1 groundwater on the site of a contemplated commercial development at the intersection of U.S. Highway 93 and Blood Lane near Hamilton, Montana.  The contemplated discharge would occur via a proposed onsite wastewater treatment facility and drainfield designed to treat sanitary and floor drain discharges from a 156,529 square-foot retail store facility to be constructed on the site. The groundwater discharge would eventually migrate down-gradient to the nearby Bitterroot River in Ravalli County.

¶3    DEQ received the application under submittal letter, dated March 31, 2014, from CT Consultants, an engineering firm in Columbus, Ohio.  The letter bore the signature of John D. Zaleha, E.I., "Project Engineer."   The application consisted of DEQ standard Forms 1 and GW-1 with referenced attachments.  As supplemented at DEQ's request, the application identified the type and nature of the contemplated facility or operation by reference to a Standard Industrial Code (SIC 5311) indicating a retail merchandise and grocery facility.  An included project site map indicated a large retail facility and parking lot that would together cover approximately half of the 16.54 acre site.  The application

---

[2] Sections 75-5-401 through -405, MCA (DEQ duty to regulate wastewater discharge pursuant to Board of Environmental Review rules), and Admin. R. M. Title 17, chapter 30, parts 1 and 10 (MGWPCS rules).

[3] A "Level 2 treatment" system is a subsurface wastewater treatment system that "(a) removes at least 60% of total nitrogen as measured from the raw sewage load to the system or systems or (b) discharges a total nitrogen effluent concentration of 24 mg/L or less."  Admin. R. M. 17.30.702(11).  The proposed wastewater treatment facility was designed to remove greater than 90 percent of total nitrogen.

4

listed the various types of contemplated effluents with their respective characteristics. As proposed, the treatment system would on average handle 5,100 gallons of effluent from sanitary wastes (95%) and floor drains (5%). As supplemented, except for identification of the contemplated facility name and the actual contemplated owner or operator, the application included all standard information typically required by DEQ for issuance of a MGWPCS permit.

¶4 The certification and signature sections of both DEQ application forms listed Ravalli County real estate broker Lee Foss (Foss) as the permit applicant. Section C of Form 1 also listed Foss as the "Facility Contact." The "Facility Information" sections of both forms listed the property's state property tax identification number (Parcel #698800) as the "Facility Name." Section F of Form 1 listed Foss as the "Applicant (Operator)" of the contemplated facility and that the listed "Operator" was not the property owner.

¶5 By correspondence to Foss dated April 21, 2014, DEQ identified and requested additional information regarding various application "deficiencies" including, *inter alia*, clarification of the name of the facility and the name of the permitee who would be "the responsible entity" to insure compliance with permit conditions for the authorized discharge. By subsequent correspondence, CT Consultants, through Project Engineer Zaleha, reiterated that the facility name was Parcel #698800 and that Foss would be the permitee, as originally listed. DEQ's Supplemental Responses to Plaintiffs' First Discovery Requests indicated that the agency's Director specifically "asked Mr. Foss to disclose the identity of the developer of the property" but "Mr. Foss declined to do so."

5

¶6      It is undisputed on the record that real estate broker Lee Foss had no intention of actually owning or operating the contemplated facility. He requested the MGWPCS permit to facilitate the sale of the property to a particular third-party known to Foss and Landowners. Upon sale of the property, Foss would transfer the permit to the intended owner or operator who would construct and operate the retail store.[4]

¶7      In May 2014, DEQ issued a Draft Checklist Environmental Assessment (draft EA), a draft wastewater discharge permit, and a permit fact sheet. The draft EA identified the proposed agency action as the issuance of a permit authorizing "discharge of treated domestic water via a subsurface drainfield [pursuant to] the Montana Groundwater Pollution Control System (MGWPCS) permit program" established by Admin. R. M. Title 17, chapter 30, part 10. The draft EA stated that the limited purpose of the permit was:

> to regulate the discharges of pollutants to state waters from the regulated facility. Issuance of an individual permit will require the applicant to implement, monitor and manage practices to prevent pollution and the degradation of ground water.

The draft permit specified allowable discharge limits for total nitrogen and total phosphorus and specified ongoing water quality monitoring and reporting measures required by DEQ. The permit fact sheet described the wastewater treatment system, point of discharge effluent limits, site hydrogeology, and vicinity groundwater quality issues.

---

[4] Opposition comments in the administrative record presume that the contemplated retail store will be a Walmart store.

The fact sheet further explained DEQ's rationale for the proposed terms and conditions of the permit.

¶8 The draft EA concluded that, as treated and discharged beyond the "approved mixing zone" on the property, the contemplated wastewater discharge would not exceed applicable water quality standards and thus would have no "significant adverse effects [on] the human and physical environment." The draft EA referenced a similar lack of significant impact on various standard physical environment checklist factors. *Inter alia*, the draft EA included a statement that "construction of the facility will alter" the existing undeveloped use of the land but not impact any "listed vegetative species." Though finding no significant adverse impact on various standard human environment checklist factors, the draft EA concluded that the construction and operation of "the facility" would have the potential to increase commercial activity in the area, increase traffic in the area, create temporary jobs during construction, create permanent jobs post-construction, and increase local tax revenue.

¶9 DEQ received written comments from approximately 160 individuals and members of local organizations. More than 80 people attended a public hearing on September 18, 2014. Due to the high level of public interest and technical difficulties with its electronic public comment submission system, DEQ extended the public comment period until October 15, 2014. On November 17, 2014, DEQ released a final EA and associated fact sheet and concurrently issued the requested wastewater discharge permit to Foss as originally recommended in the draft EA.

7

¶10 With a few exceptions, the final EA mirrored the draft EA. Based on new information provided by commenters regarding the existence of a down-gradient natural spring near the project area, the final EA noted that DEQ lowered the permissible level of phosphorous discharge from the proposed wastewater treatment facility. *Inter alia*, the document concluded that the treatment system and expected wastewater discharges to groundwater would result in "no potential adverse impact to elk winter range."

¶11 DEQ organized public comments by topic and prepared 106 formal responses to address public concerns. The agency noted that most issues raised by commenters were "beyond the scope" of the agency's EA analysis, and declined to address various stated public concerns about non-water quality related impacts of the construction and operation of the larger retail facility, including the potential spread of noxious weeds, "light pollution," noise pollution, air pollution, soil pollution, permanent traffic increases, traffic safety, building aesthetics, scenic degradation, the risk of decreases in nearby residential property values, and the effect of marketplace competition on other local businesses and employees. The final EA further stated that DEQ had no authority to require the developer to build at an alternative site in Hamilton to allow connection to the city sewage treatment system and thereby eliminate the need for the contemplated groundwater discharge. The final EA did address questions regarding the adequacy of self-monitoring of the treatment facility by the owner or operator and public perception of a need for additional down-gradient water quality monitoring.

¶12 The final EA referenced various secondary impacts identified in the draft EA, but this time more narrowly characterized them as impacts resulting from the construction of

the subject wastewater treatment system rather than impacts of the larger construction and operation of the retail facility. The final EA ultimately concluded that MEPA did not require a formal environmental impact statement (EIS) "because the project lacks significant adverse effects to the human or physical environment." With reference to DEQ's limited authority to regulate groundwater discharges "to ensure the protection of the beneficial uses of state waters and compliance with the applicable water quality standards," the EA concluded that DEQ complied with all applicable MEPA requirements.

¶13 On January 14, 2015, Bitterrooters petitioned the Montana First Judicial District Court for judicial review on the asserted grounds that DEQ's wastewater discharge permitting process violated the Montana Water Quality Act (MWQA), MEPA, and the public's right to participate in governmental deliberations under Article II, Section 8 of the Montana Constitution and § 2-3-101, MCA, et seq. Bitterrooters alleged that the issuance of the wastewater discharge permit violated MWQA by failing to adequately consider the impact of the contemplated wastewater discharge on the water quality of the nearby Bitterroot River and tributaries. They alleged that the permit violated both MWQA and MEPA by failing to adequately consider the cumulative water quality impacts of wastewater discharges from the contemplated retail facility in conjunction with previously permitted discharges from the nearby Grantsdale subdivision. Bitterrooters asserted that the process further violated MEPA by failing to adequately consider the secondary impacts of the larger construction and operation of the retail facility unrelated to water quality. On May 16, 2016, on consideration of the parties' respective motions to dismiss and for summary judgment pursuant to M. R. Civ. P. 12(b)(6) and 56, the District Court:

9

(1) dismissed Bitterrooters' right-to-participate claim as time-barred by the applicable statute of limitations, §§ 2-3-114 and -213, MCA;

(2) granted summary judgment that DEQ violated MWQA by failing to adequately consider:

   (A) the effect of the contemplated discharge of nitrate-contaminated groundwater on the quality of nearby surface waters in violation of § 75-5-301(5)(d), MCA, and Admin. R. M. 17.30.715(1)(d); and

   (B) the cumulative water quality effects of wastewater discharges from the contemplated retail facility and the nearby Grantsdale subdivision in violation of Admin. R. M. 17.30.715(2)(a);

(3) granted summary judgment that DEQ violated MEPA by failing to adequately consider:

   (A) the cumulative water quality effects of wastewater discharges from the contemplated retail facility and the nearby Grantsdale subdivision as required by § 75-1-208(11), MCA, and Admin. R. M. 17.4.603(7) and (12); .609(3)(d) and (e);

   (B) impacts of the construction and operation of the contemplated retail facility as secondary impacts of issuance of the wastewater discharge permit in violation of Admin. R. M. 17.4.603(12) and (18) and .609(3)(d) and (e); and

(4) granted summary judgment that Admin. R. M. 17.4.609(3)(d) (criteria for evaluation of cumulative and secondary impacts of state action on physical environment) required DEQ to identify the "facility operator if the operator's identity has the potential to impact vegetation, aesthetics, human health and safety, industrial and commercial activities, employment, tax revenues, demand for government services, or other environmental resources."

¶14 DEQ appeals only the District Court's ruling that it violated MEPA by failing to consider environmental impacts of the construction and operation of the facility other than water quality impacts and impacts of the related construction of the required wastewater treatment system. Landowners join DEQ's appeal and further separately appeal the District

10

Court's ruling that Admin. R. M. 17.4.609(3)(d) requires disclosure of the identity of the actual contemplated owner or operator of the retail facility.

## STANDARDS OF REVIEW

¶15 We review a district court's grant or denial of summary judgment, and related conclusions of law, de novo for correctness. *Smith v. BNSF Railway*, 2008 MT 225, ¶ 10, 344 Mont. 278, 187 P.3d 639; *Montana Trout Unlimited v. Montana Dep't of Nat. Res. & Conserv.*, 2006 MT 72, ¶ 17, 331 Mont. 483, 133 P.3d 224. The standard of review of the sufficiency of an agency's environmental review under MEPA is whether the decision was unlawful or arbitrary and capricious. Section 75-1-201(6)(a)(iii), MCA; *Montana Wildlife Fed. v. Mont. Bd. of Oil & Gas Conserv.*, 2012 MT 128, ¶ 25, 365 Mont. 232, 280 P.3d 877. An agency decision is unlawful if it does not comply with governing laws and administrative rules. *North Fork Preservation Ass'n v. Dep't of State Lands*, 238 Mont 451, 459, 778 P.2d 862, 867 (1989). We will sustain an agency's interpretation of its rule "so long as it lies within the range of reasonable interpretation permitted by" the language of the rule. *Clark Fork Coal. v. Montana Dep't of Envt'l Quality*, 2008 MT 407, ¶ 20, 347 Mont. 197, 197 P.3d 482.

¶16 An agency decision is arbitrary and capricious if made without consideration of all relevant factors or based on a clearly erroneous judgment. *Clark Fork Coal.*, ¶ 21; *North Fork Preservation Ass'n*, 238 Mont at 465, 778 P.2d at 871. However, the arbitrary and capricious standard does not permit reversal "merely because the record contains inconsistent evidence or evidence which might support a different result." *Montana Wildlife Fed.*, ¶ 25. Rather, the decision "must appear to be random, unreasonable or

seemingly unmotivated based on the existing record." *Montana Wildlife Fed.*, ¶ 25. We cannot substitute our judgment for that of the agency but will not defer to an agency decision without a searching and careful review of the record to verify that the agency made a reasoned decision. *Friends of the Wild Swan v. Dep't of Nat. Res. & Conservation*, 2000 MT 209, ¶ 28, 301 Mont. 1, 6 P.3d 972; *North Fork Preservation Ass'n*, 238 Mont. at 465, 778 P.2d at 871.

## DISCUSSION

¶17 Mindful of the Legislature's constitutional duty to maintain and provide for a clean and healthful environment,[5] and for the purpose of protecting our environment in balance with the right to use and enjoy private property free from undue government regulation, MEPA requires state agencies to conduct an environmental review of any contemplated agency action that may have an impact on the human environment. Sections 75-1-102, -201(1), and -220(5), MCA. Within the required scope of review, MEPA requires agencies "to take a hard look" at the environmental impacts of contemplated agency action. *Montana Wildlife Fed.*, ¶ 43. "Implicit in the requirement that an agency take a hard look at the environmental consequences of its actions is the obligation to make

---

[5] Montana Constitution, Article IX, Section 1, provides:

> (1) The state and each person shall maintain and improve a clean and healthful environment in Montana for present and future generations.
>
> (2) The legislature shall provide for the administration and enforcement of this duty.
>
> (3) The legislature shall provide adequate remedies for the protection of the environmental life support system from degradation and provide adequate remedies to prevent unreasonable depletion and degradation of natural resources.

*See also*, Mont. Const. art. II, § 3 (individual right to a clean and healthful environment).

an adequate compilation of relevant information, to analyze it reasonably, and to consider all pertinent data." *Clark Fork Coal.*, ¶ 47.

¶18 However, MEPA requirements are merely "procedural" and do not require an agency to reach any particular decision in the exercise of its independent authority. Section 75-1-102(1), MCA; *Montana Wildlife Fed.*, ¶ 32. *See also*, § 75-1-102(3)(b), MCA (MEPA provides no additional regulatory authority to an agency and does not affect an agency's specific statutory duties to comply with environmental quality standards); § 75-1-201(4)(a), MCA (reviewing "agency may not withhold, deny, or impose conditions on any permit or other authority to act based on" MEPA). The essential purpose of MEPA is to aid in the agency decision-making process otherwise provided by law by informing the agency and the interested public of environmental impacts that will likely result from agency actions or decisions. Sections 75-2-102(1)(b) and (3)(a), MCA. Because the Legislature modeled MEPA on the National Environmental Policy Act (NEPA),[6] federal authority construing NEPA is generally persuasive guidance in the construction of similar provisions of MEPA. *North Fork Preservation Ass'n*, 238 Mont. at 457, 778 P.2d at 866; *Ravalli County Fish & Game Ass'n v. Montana Dep't of State Lands*, 273 Mont. 371, 377, 903 P.2d 1362, 1367 (1995).

¶19 *Issue 1: Does MEPA require DEQ to consider non-water quality related environmental impacts of the construction and operation of a retail store facility as secondary impacts of the issuance of a Montana Water Quality Act (MWQA) permit to discharge facility wastewater into the ground from an onsite wastewater treatment system?*

---

[6] 42 U.S.C. § 4321, et seq.

13

¶20 MEPA requires an agency to produce a formal environmental impact statement (EIS) if an agency action will significantly affect the quality of the human environment. Section 75-1-201(1)(b)(iv), MCA; *Montana Wildlife Fed.*, ¶ 43. However, MEPA does not require an EIS if a preliminary EA determines that the agency action will *not* significantly affect the quality of the human environment. Section 75-1-201(1)(b)(iv), MCA; Admin. R. M. 17.4.607(2) and .608 (general environmental review requirements); *Kadillak v. Anaconda Co.*, 184 Mont. 127, 134, 602 P.2d 147, 152 (1979). An EA thus serves as both the initial tool for determining whether a more intensive EIS is necessary and as the mechanism for required environmental review of agency actions that will likely impact the environment but not sufficiently to require an EIS. Sections 75-1-102(1) and (3)(a), -201(1)(a) and (b)(i)(B), and -220(5), MCA (EIS/EA purposes, definitions, legislative intent, and general requirements for "adequate review" of environmental impact of "state actions"); Admin. R. M. 17.4.607(2) through (4) and 17.4.608, (environmental review requirements and significant impact evaluation criteria). On appeal, Bitterrooters do not contest DEQ's determination that an EA would suffice as the mechanism for required environmental review based on its threshold determination that issuance of the contemplated wastewater discharge permit will not significantly affect the quality of the human environment.[7] Bitterrooters similarly do not challenge DEQ's identification and evaluation of alternatives to the issuance of a discharge permit as required by §§ 75-1-

---

[7] It is undisputed on the record that the contemplated wastewater discharge will not exceed a 7.5 mg/L nitrate concentration thus effecting a "nonsignificant change" in groundwater quality that will not cause degradation to surface water under § 75-5-301(5)(d), MCA (MWQA water quality standards).

14

201(1)(b)(i)(B) and -220(1), MCA. Therefore, we review Bitterrooters' assertion of error only as it relates to the sufficiency of the final EA as the mechanism of required MEPA review.

¶21 Except for requiring evaluation of cumulative impacts of a proposed project "when appropriate," § 75-1-208(11), MCA, MEPA does not specify the required contents or scope of a preliminary EA. *See*, *e.g.*, §§ 75-1-102(1) and (3), -201(1)(b)(i)(B), and -220(5), MCA. In this context, the Legislature has directed the Montana Board of Environmental Review (BER) to promulgate rules specifying the general MEPA requirements for DEQ actions. Sections 75-5-103(3) and -201, MCA (BER rulemaking authority under MWQA); Admin. R. M. 17.4.102, .607(2) through (4), .608, and .609. An EA may be in a "standard checklist" form for "routine action with limited environmental impact." Admin. R. M. 17.4.609(2). For other actions, an EA must be in a narrative form "containing a more detailed analysis of specified criteria." Admin. R. M. 17.4.609(2) and (3). In either form, an EA must include, *inter alia*, "an evaluation of the impacts, including cumulative and secondary impacts," on the "physical environment" and on the "human population in the area to be affected by the proposed action." Admin. R. M. 17.4.609(3)(d) and (e); *see also*, §§ 75-1-102(1) and (3)(a), -201(1)(a), -208(11), and -220(5), MCA (*in re* cumulative impacts). Impacts may be adverse, beneficial, or both. Admin. R. M. 17.4.608(2).

¶22 Relevant criteria for evaluation of secondary impacts of the proposed action on the physical environment include, "*where appropriate*[,] terrestrial and aquatic life and habitats; water quality, quantity, and distribution; geology; soil quality, stability, and moisture; vegetation cover, quantity and quality; aesthetics; air quality; unique,

endangered, fragile, or limited environmental resources; historical and archaeological sites; and demands on environmental resources of land, water, air and energy." Admin. R. M. 17.4.609(3)(d) (emphasis added). The term "human environment" includes "biological, physical, social, economic, cultural, and aesthetic factors that interrelate to form the environment." Admin. R. M. 17.4.603(12). Relevant criteria for evaluation of secondary impacts of a proposed action *on the affected human population* include, "*where appropriate*, social structures and mores; cultural uniqueness and diversity; access to and quality of recreational and wilderness activities; local and state tax base and tax revenues; agricultural or industrial production; human health; quantity and distribution of employment; distribution and density of population and housing; demands for government services; industrial and commercial activity; locally adopted environmental plans and goals; and other appropriate social and economic circumstances." Admin. R. M. 17.4.609(3)(e) (emphasis added). By operation of the qualifying language "where appropriate," the laundry lists of secondary impact evaluation criteria in Admin. R. M. 17.4.609(3)(d) and (e), are not mandatory evaluation criteria in every case. Rather, the relevance or propriety of particular criterion, if any, depends on the nature of the proposed state action in each particular case.

¶23    Though it mandates "adequate review" of potential environmental impacts of state actions, MEPA does not specifically define what constitutes a triggering state action. *See, e.g.,* §§ 75-1-102(1), -201(1)(b)(iv), -220(5), MCA. *See also*, § 75-1-220(8), MCA (defining "state-sponsored project" and distinguishing state-sponsored projects from projects or activities involving the issuance of a state permit). In the current absence of a

16

statutory definition, administrative rule defines state "action" to include an "activity involving the issuance of a . . . permit . . . for use or permission to act by the agency." Admin. R. M. 17.4.603(1); *see also*, § 75-1-102(3)(a), MCA (MEPA applies to state agency "decisions"). In this case, the state action triggering MEPA review was the proposed issuance of a DEQ MGWPCS groundwater discharge permit pursuant to Title 75, chapter 5, part 4, MCA, and Admin. R. M. Title 17, chapter 30, part 10.

¶24    For purposes of MEPA, "secondary impact" means "a further impact to the human environment that may be stimulated or induced by or otherwise result from a direct impact of the action." Admin. R. M. 17.4.603(18). MEPA statutes and rules do not define the term "direct impact." By comparison, NEPA does not define a "direct impact" but defines "direct effects" as effects or impacts "*caused by the action* . . . at the same time and place." 40 C.F.R. § 1508.8(a) (emphasis added). In concluding that Admin. R. M. 17.4.609(3)(d) and (e) required DEQ to consider impacts of the construction and operation of the facility beyond those merely related to water quality or the construction of the required wastewater system, the District Court essentially concluded that those other impacts were secondary impacts of the issuance of the permit itself rather than of the permitted activity. In other words, the construction and operation of the retail store would not occur "*but for*" the issuance of the wastewater permit. Thus, the District Court expansively shifted the focus of MEPA on impacts caused by the permitted action to the much broader and more attenuated action and resulting impacts that would not occur "but for" the issuance of the permit.

17

¶25 The District Court's expansive tail-wagging-the-dog reasoning is backwards as a matter of fact and erroneous as a matter of law. Logically, the permitted wastewater discharge from the facility, and the related construction of its component wastewater treatment system, are not the causes-in-fact of the larger construction and operation of the retail store. Rather, the construction and operation of the retail store are the causes-in-fact of the wastewater discharge and related treatment system. MEPA, like NEPA, requires "a reasonably close causal relationship" between the subject government action and the particular environmental effect. *Department of Transportation v. Public Citizen*, 541 U.S. 752, 767, 124 S. Ct. 2204, 2215 (2004); *Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 773, 103 S. Ct. 1556, 1561 (1983) (NEPA requires a "reasonably close causal relationship between a change in the physical environment and the effect at issue"); *see also*, Admin. R. M. 17.4.603(1) (defining state "action" in terms of the permitted activity); 40 C.F.R. § 1508.8(a) (defining "direct effect" as an impact "caused by the action").

¶26 In *Public Citizen*, various unions and environmental groups asserted that a sub-agency of the U.S. Department of Transportation (USDOT) responsible for regulating motor carrier safety violated NEPA by failing to consider potential environmental impacts of increased Mexican commercial truck traffic in the U.S. when it adopted safety regulations applicable to Mexican trucks independently authorized to operate in the U.S. by the controversial North American Free Trade Agreement (NAFTA). *Public Citizen*, 541 U.S. at 758-62, 124 S. Ct. at 2210-12. The sub-agency's EA narrowly focused on environmental impacts of the increase in roadside safety inspections that would result from

its more stringent vehicle safety regulations. *Public Citizen*, 541 U.S. at 761, 124 S. Ct. at 2212. The EA concluded that NEPA did not require the sub-agency to consider the broader environmental impacts of increased Mexican truck traffic in the U.S. because NAFTA, and related presidential action, was the cause of the traffic increase, not the sub-agency's safety regulations. *Public Citizen*, 541 U.S. at 761, 124 S. Ct. at 2212. On review, the U.S. Ninth Circuit Court of Appeals agreed with the environmental groups and unions that the sub-agency EA violated NEPA because, even though NAFTA was the cause of the traffic increase, Mexican trucks could not operate here unless they complied with the sub-agency's safety regulations. *Public Citizen*, 541 U.S. at 761, 124 S. Ct. at 2212.

¶27 On appeal, the United States Supreme Court characterized the Ninth Circuit's expansive construction of NEPA as "a particularly unyielding variation of 'but for' causation, where an agency's action is considered a cause of an environmental effect even when the agency has no authority to prevent the effect." *Public Citizen*, 541 U.S. at 767, 124 S. Ct. at 2215. The Supreme Court held that the Ninth Circuit's expansive "but for" standard of causation was "insufficient to make an agency responsible for a particular effect" because "NEPA requires 'a reasonably close causal relationship' between the environmental effect and the alleged cause." *Public Citizen*, 541 U.S. at 767, 124 S. Ct. at 2215 (quoting *Metropolitan Edison Co.*, 460 U.S. at 773-74, 103 S. Ct. at 1561). By analogy to the "familiar doctrine of proximate cause from tort law," the Court characterized NEPA's more demanding causation standard as drawing a "manageable line between those causal changes that may make an actor responsible for an effect and those that do not." *Public Citizen*, 541 U.S. at 767, 124 S. Ct. at 2215. The Supreme Court thus analyzed the

requisite causal connection triggering NEPA review as a function of NEPA's essential purposes to ensure that (1) agencies adequately consider environmental impacts of their actions and (2) the interested public can monitor agency proceedings and "play a role" in the agency decision-making process and the implementation of the decisions. *Public Citizen*, 541 U.S. at 768, 124 S. Ct. at 2216. The Court emphasized NEPA's essential informational purpose to allow the interested public to "provide input as necessary *to the agency* making the relevant decisions." *Public Citizen*, 541 U.S. at 768, 124 S. Ct. at 2216 (emphasis added).

¶28 Noting that the USDOT motor carrier safety sub-agency had no authority to regulate the increase in Mexican truck traffic caused by NAFTA, the Supreme Court concluded that requiring the sub-agency to consider impacts it could not prevent would not serve NEPA's essential purposes. *Public Citizen*, 541 U.S. at 768-69, 124 S. Ct. at 2216. Thus, the Court held that an "agency cannot be considered a legally relevant 'cause'" of an effect when the agency cannot prevent the effect in the lawful exercise of its limited authority. *Public Citizen*, 541 U.S. at 770, 124 S. Ct. at 2217. *See also*, *Winnebago Tribe of Neb. v. Ray*, 621 F.2d 269, 273 (8th Cir. 1980) (Corps of Engineers' NEPA review authority limited to review of matters within its regulatory jurisdiction notwithstanding that larger power line project was necessarily contingent on water-crossing permit); *Save the Bay, Inc. v. U.S. Army Corps of Engineers*, 610 F.2d 322, 327 (5th Cir. 1980) (Corps of Engineers' NEPA review authority limited to review of matters within its regulatory jurisdiction notwithstanding that larger pipeline project was necessarily contingent on water-crossing permit); *Residents for Sane Trash Solutions v. U.S. Army Corps of Engineers*, 31 F. Supp.

3d 571, 588-90 (S.D. N.Y. 2014) (Corps of Engineers' NEPA review authority limited to review of matters within its regulatory jurisdiction notwithstanding that larger garbage plant project was contingent on harbor dredging permit).

¶29 We reached a similar result under MEPA in *Montana Wilderness Ass'n v. Montana Bd. of Health & Env'tl Sciences*, 171 Mont. 477, 559 P.2d 1157 (1976). In that case, wilderness and environmental protection groups challenged the sufficiency of an EIS issued by DEQ's predecessor agency, the Department of Health and Environmental Services (DHES), incident to issuance of a certificate of approval of a proposed 95-acre subdivision in the Big Sky resort area for compliance with applicable water supply, sewage, and solid waste disposal regulations. *Montana Wilderness Ass'n*, 171 Mont. at 478-82, 559 P.2d at 1158-59. The plaintiffs asserted that DHES violated MEPA by failing to consider the potential environmental impacts of the proposed subdivision beyond the impacts of the water supply, sewage, and solid waste disposal issues within the scope of DHES' regulatory authority. *Montana Wilderness Ass'n*, 171 Mont. at 480-82, 559 P.2d at 1159. Reasoning that the proposed subdivision could not proceed without the requested water supply, sewage, and solid waste disposal regulation compliance certificate, the District Court concluded that MEPA required DHES to consider all potential environmental impacts of the subdivision regardless of the limited scope of its regulatory authority. *Montana Wilderness Ass'n*, 171 Mont. at 482-83, 559 P.2d at 1160. We reversed, holding that the District Court's reasoning erroneously extended DHES "control over subdivisions beyond" the scope of its limited authority to enforce applicable water supply, sewage, and solid waste disposal regulations. *Montana Wilderness Ass'n*, 171

Mont. at 484-85, 559 P.2d at 1161. In so holding, we noted that the Legislature placed general regulatory control over subdivisions in the hands of local governments rather than agencies of the State. *Montana Wilderness Ass'n*, 171 Mont. at 485-86, 559 P.2d at 1161 (citing 1973 Montana Subdivision and Platting Act); *see also*, §§ 75-1-102(1) and -201(1)(b), MCA (MEPA applicable to state agencies only).

¶30 In this case, the District Court concluded that "*Montana Wilderness* is no longer binding authority" on the asserted grounds that it is contrary to MEPA's statutory command that agencies comply with the environmental review requirements "to the fullest extent possible" and similarly "at odds with subsequent NEPA case law requiring agencies to consider reasonably foreseeable indirect effects of an action, even when local or state entities are authorized to make the ultimate decision." However, as pertinent, MEPA remains substantially unchanged and this Court has not overruled or limited *Montana Wilderness* in the 40 years since we issued it. More significantly, while MEPA and NEPA do indeed command agencies to comply with applicable environmental review requirements "to the fullest extent possible," we cannot properly construe MEPA in isolation. MEPA and NEPA must be construed in harmony with the substantive limitations of an agency's applicable regulatory authority. *Public Citizen*, 541 U.S. at 769, 124 S. Ct. at 2217; *Montana Wilderness Ass'n*, 171 Mont. at 484-85, 559 P.2d at 1161; §§ 75-1-102(3)(b) and -104(1), MCA (MEPA provides no additional regulatory authority to an agency and does not affect an agency's specific statutory duties to comply with environmental quality standards). *See also*, §§ 75-1-102(1) and -201(4)(a), MCA (reviewing "agency may not withhold, deny, or impose conditions on any permit or other

22

authority to act based on" MEPA); *Flint Ridge Development Co. v. Scenic Rivers Ass'n*, 426 U.S. 776, 787, 96 S. Ct. 2430, 2438 (1976) (quoting NEPA legislative history indicating Congressional intent that federal agencies comply with NEPA requirements "'to the fullest extent possible' under their statutory authorizations"); *Calvert Cliffs Coord. Comm. v. U.S. Atomic Energy Comm.*, 449 F.2d 1109, 1115 (D.C. Cir. 1971) (noting NEPA § 102 intent to require agency compliance with NEPA requirements to fullest extent possible within scope of independent agency authority).

¶31    In support of its ruling, the District Court cited *Chelsea Neighborhood Ass'n v. U.S. Postal Service*, 516 F.2d 378 (2nd Cir. 1975) (requiring U.S. Postal Service to consider impacts of contemplated third-party construction of multi-story housing project on top of a contemplated ground floor postal vehicle maintenance facility as a secondary impact of construction of the postal facility); *City of Davis v. Coleman*, 521 F.2d 661, 679-82 (9th Cir. 1975) (requiring USDOT to consider environmental, economic, and social effects of future urban development as indirect impacts of contemplated construction of a new interstate freeway interchange); and *Sierra Club v. Marsh*, 769 F.2d 868 (1st Cir. 1985) (requiring Federal Highway Administration and Corps of Engineers to consider environment impacts of contemplated heavy industrial development as indirect impacts of issuance of federal funding and permits for construction of a cargo ship port and causeway on an undeveloped island adjacent to an industrialized seaport).  With some variations and distinctions, the cases cited by the District Court are arguably consistent with Bitterrooters' expansive "but for" theory of MEPA causation insofar as they focused on potential impacts of contemplated future development that would result beyond the agency authority over

23

the action that triggered NEPA review in the first place. However, the federal Circuit Courts decided those cases long before the U.S. Supreme Court clarified the appropriate standard of NEPA causation in *Public Citizen*. Thus, in light of *Public Citizen*, prior inconsistent lower court decisions in *Chelsea*, *Davis*, and *Sierra Club* are distinguishable and insufficiently persuasive to overrule or limit *Montana Wilderness*.

¶32 In apparent recognition of this problem, Bitterrooters cite *Save Our Sonoran, Inc. (SOS) v. Flowers*, 408 F.3d 1113 (9th Cir. 2005) (requiring Corps of Engineers to consider impacts of private construction of gated community in Arizona desert as secondary impacts of issuance of permit to dredge and fill dry streambeds that collected and carried occasional heavy rain runoff) as additional support for the District Court's ruling. However, *SOS* is factually distinguishable because: (1) the Corps had authority to regulate the filling of dry streambeds in the Arizona desert; (2) dry capillaries to the streambeds inextricably permeated the entirety of the subdivision site; and (3) extensive filling of the entirety of the system on the subdivision site would impact plants and animals dependent on water collected by the system. *SOS*, 408 F.3d at 1118-23. Despite loose dictum that NEPA required the Corps to consider environmental impacts "with no impact on [its] jurisdictional waters," the Ninth Circuit actually recognized *Public Citizen*'s more stringent NEPA causation standard and merely held that the requisite "causal nexus" existed on the unique facts of the case between the Corps' independent regulatory authority and the subject environmental impacts. *SOS*, 408 F.3d at 1121-23. Consequently, *SOS* is

not persuasive authority upon which to distinguish *Public Citizen* or overrule or limit *Montana Wilderness*.[8]

¶33 We hold that MEPA, like NEPA, requires a reasonably close causal relationship between the triggering state action and the subject environmental effect. We reject the unyielding "but for" causation standard asserted by Bitterrooters to the effect that a state action is a cause of an environmental impact regardless of whether the agency, in the lawful exercise of its independent authority, can avoid or mitigate the effect. We hold that, for purposes of MEPA, an agency action is a legal cause of an environmental effect only if the agency can prevent the effect through the lawful exercise of its independent authority. As in *Public Citizen*, requiring a state agency to consider environmental impacts it has no authority to lawfully prevent would not serve MEPA's purposes of ensuring that agencies and the interested public have sufficient information regarding relevant environmental impacts to inform the lawful exercise of agency authority. Sections 75-1-102(3), -104(1), -201(4)(a), MCA. Section 75-1-201(1), MCA, merely requires state

---

[8] Eliminating any doubt as to its adherence to *Public Citizen*, the Ninth Circuit more recently observed:

> Even when a major federal action occurs, however, NEPA remains subject to a "rule of reason" that frees agencies from preparing a full EIS on "the environmental impact of an action it could not refuse to perform." *Pub. Citizen*, 541 U.S. at 769, 124 S. Ct. 2204. Thus, "where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions," the agency "[does] not need to consider the environmental effects arising from" those actions. *Id.* at 770, 124 S. Ct. 2204.

*Alaska Wilderness League v. Jewell*, 788 F.3d 1212, 1225-26 (9th Cir. 2015) (holding that federal agency approval of oil and gas lease for off-shore drilling on Alaska's Arctic coastline did not trigger NEPA consideration of sufficiency of oil company's oil spill response plan where company otherwise satisfied legal criteria for lease approval within scope of agency authority).

agencies to comply with applicable MEPA requirements "to the fullest extent possible" within the scope of the lawful exercise of their independent authority. *Accord*, §§ 75-1-102(3), -104(1), -201(4)(a), MCA.

¶34 Contrary to the assertions of the dissent in *Montana Wilderness* and Bitterrooters here, our holdings in these cases do not gut MEPA. In accordance with its express language, MEPA still requires state agencies to adequately consider, "to the fullest extent possible" within the scope of their independent authority, all direct and secondary environmental impacts that will likely result from the specific activity conducted or permitted by the agency. The problem for Bitterrooters is that the broader environmental impacts of the larger construction and operation of the retail store are not subject to MEPA review because the Legislature has not placed general land use control in the hands of a state agency. As recognized in *Montana Wilderness* over 40 years ago, the Legislature has, with limited exceptions, placed general land use control beyond the reach of MEPA in the hands of local governments. *See*, Title 76, chapters 1-3, MCA (Subdivision and Platting Act and local zoning enabling Acts). Regardless of MEPA's manifest beneficial purpose and Bitterrooters' otherwise compelling public policy arguments, we simply cannot properly stretch MEPA beyond the limits of its language and stated purpose to fill an environmental review gap created by the Legislature and remaining within its domain to remedy if so inclined.

¶35 In this case, the District Court did not conclude that DEQ failed to adequately consider the secondary environmental impacts, as defined by Admin. R. M. 17.4.609(3)(d) and (e), of the permitted wastewater discharge or related construction of the required

wastewater treatment system. Rather, the District Court concluded that DEQ violated Admin. R. M. 17.4.609(3)(d) and (e) by failing to consider other non-water quality related impacts of the larger construction and operation of the facility as secondary impacts of issuance of the contemplated MWQA wastewater discharge permit. Bitterrooters acknowledge that, had DEQ expanded the scope of its EA beyond its water quality regulatory authority to consider those impacts as demanded, it would have had no authority to deny or limit the requested MWQA wastewater discharge permit to prevent or mitigate those impacts. *See*, §§ 75-1-102(3)(b), -104(1), and -201(4)(a), MCA. Thus, issuance of the requested MWQA wastewater permit was not a legal cause of environmental impacts of the larger construction and operation of the retail facility unrelated to water quality or the construction of the required wastewater treatment system. We hold that the District Court erroneously concluded that DEQ violated MEPA, in contravention of Admin. R. M. 17.4.609(3)(d) and (e), by failing to further consider the environmental impacts of the construction and operation of the facility other than water quality impacts and impacts of the related construction of the required wastewater treatment system.

¶36 *Issue 2: Does MEPA require DEQ to identify the actual owner or operator of a wastewater treatment facility prior to issuing a MWQA groundwater discharge permit?*

¶37 Incident to its MEPA secondary impacts ruling, the District Court further ruled:

> When it reconsiders Foss' application, . . . DEQ must identify the facility operator if the operator's identity has the potential to impact vegetation, aesthetics, human health and safety, industrial and commercial activities, employment, tax revenues, demand for government services, or other environmental resources.

27

In context, and by comparison of similar language, we infer the unattributed source of the referenced criteria to be Admin. R. M. 17.4.603(12) and .609(3)(d) and (e) (cumulative and secondary impact evaluation criteria). Thus, the District Court essentially ruled that MEPA requires DEQ to identify the contemplated facility operator if the facility operator, in conjunction with the nature of the operation, is predisposed to operate the facility in a manner that has the potential to impact any of the evaluation criteria referenced in Admin. R. M. 17.4.609(3)(d) and (e).

¶38 Landowners assert that the District Court improperly crafted an unnecessary and unworkable test from whole cloth. They further assert that District Court's test is no test at all because it will always require DEQ to speculatively assess potential environmental impacts of a subject activity based on the identity, reputation, and past practices of the contemplated facility owner and operator. Landowners finally assert that the test is unnecessary in any event because all interested parties now know the identity of the contemplated owner and operator of the subject facility, *i.e.*, Walmart, and that Admin. R. M. 17.30.1360 will ultimately require identification, and afford DEQ an opportunity for subsequent review of permit conditions, upon the eventual transfer of the permit to the actual contemplated owner or operator.

¶39 Bitterrooters contrarily assert that the identity of the contemplated owner and operator of a permitted facility is information directly relevant to consideration of the potential environmental impacts of the construction and operation of the facility as a whole. Without citation to any statutory or administrative provision of MEPA or MWQA, Bitterrooters assert that "secretive planning serves no legitimate public policy purpose"

28

and "leaving the identity of the true applicant a secret violates the letter and spirit of MEPA." DEQ is strangely silent on the issue.

¶40 At the crux of the matter, contrary to Landowners' assertion, the transfer of an agency permit to a new owner or operator generally will "not trigger [MEPA] review." Section 75-1-201(1)(d), MCA (permit transfer triggers MEPA only upon "a material change in terms or conditions" of the permit or as otherwise provided by law). Page 13, Section M, of the subject DEQ-Foss MGWPCS permit expressly provides that "[t]his permit may be automatically transferred" to a new permitee on thirty-day notice to DEQ, payment of applicable fees, and submittal of a written transfer agreement between Foss and the transferee "containing a specific date for transfer of permit responsibility, coverage, and liability between them." Thus, Landowners' assertion that subsequent identification of the actual owner or operator on transfer of the permit will remedy any legitimate environmental concern is somewhat disingenuous given that the contemplated transfer will not likely trigger MEPA review. By the same token, despite the facial appeal of Bitterrooters' concern that non-disclosure of the identity of the contemplated owner or operator of a facility could potentially result in inadequate review of an agency action otherwise subject to MEPA, the concern is unsubstantiated on the factual record in this case. More significantly, Bitterrooters' assertion, and the District Court's resulting ruling, is unsupported by any legal authority other than the general principle that MEPA requires an agency to adequately compile and assess all environmental data relevant to a particular agency action. *See, Clark Fork Coal.*, ¶ 47; *Ravalli County Fish & Game Ass'n*, 273 Mont. at 381, 903 P.2d at 1369. Rather than follow the parties down the garden path into the

29

public policy realm of the Legislature while DEQ stands quietly by, we more fundamentally and appropriately look to the largely overlooked governing requirements for MWQA permits.

¶41    With its limited focus on identification and assessment of relevant environmental impacts of proposed state agency actions, MEPA does not govern what information an application must contain for issuance of an agency permit subject to MEPA review. For the sole purpose of determining the deadlines for agency completion of required environmental review under § 75-1-208(4)(a), MCA, and Admin. R. M. 17.4.620, MEPA defines a "complete application" as:

> an application for a permit, license, or other authorization that contains all data, studies, plans, information, forms, fees, and signatures *required* to be included with the application sufficient *for the agency to approve the application under the applicable statutes and rules*.

Section 75-1-220(3), MCA (emphasis added). As contemplated by the highlighted language of § 75-1-220(3), MCA, MWQA governs what information an application must contain for issuance of an MGWPCS discharge permit. Sections 75-5-401 and -402, MCA (DEQ duty under MWQA to regulate wastewater discharge pursuant to BER rules); Admin. R. M. Title 17, chapter 30, parts 1 and 10 (BER groundwater discharge rules).

¶42    As pertinent, MWQA rules expressly provide that the "*owner or operator* of any proposed source . . . which may discharge pollutants into state ground waters *shall file* a *completed* MGWPCS permit *application*" at least 180 days prior to the proposed operation. Admin. R. M. 17.30.1023(3) (emphasis added). All MGWPCS permit applications "must be submitted on [DEQ] forms . . . and must contain" certain enumerated information "as

30

deemed necessary by" DEQ. Admin. R. M. 17.30.1023(4). Pursuant to its "one common system for issuing permits for point sources[9] discharging pollutants into state waters," DEQ requires MGWPCS permit applicants to submit applications on DEQ standard Forms 1 and G-W. Admin. R. M. 17.30.1023(4), and (6), .1301(1). *See also*, DEQ Form GW-1 ("this form must be accompanied by DEQ Form 1") and Admin. R. M. 17.30.1304(5) and .1322(1)(a) and (b) ("all applicants shall submit applications" on DEQ standard Form 1 available at http://perma.cc/MD4G-2XPW). For purposes of the applicable MWQA regulations and DEQ Form 1, the term "'owner or operator' means any person *who owns . . .*, *operates*, *controls*, *or supervises* a point source." Admin. R. M. 17.30.1304(48). MGWPCS rules specifically command that:

> No application will be processed by [DEQ] until *all* of the requested information is supplied and the application is complete. [DEQ] shall make a determination of the completeness of the information with 30 calendar days of receipt of an application.

Admin. R. M. 17.30.1024(1) (emphasis added).

¶43 Here, the subject wastewater permit application identified real estate broker Lee Foss as the applicant and contemplated operator of the proposed retail facility and required wastewater treatment system. However, it is undisputed on the record that Foss was never going to be the actual owner or operator of the facility. He requested the MGWPCS permit to facilitate the sale of the property to a particular third-party known to Foss and

---

[9] "'Point source' means a discernible, confined, and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, or vessel or other floating craft, from which pollutants are or may be discharged." Section 75-5-103(29), MCA; Admin. R. M. 17.30.1304(51).

Landowners who would then construct and operate the facility. Upon sale of the property, Foss would transfer the permit to the intended owner and operator. Thus, Foss was not the owner or operator, or even the contemplated owner or operator, of the subject facility as referenced in Admin. R. M. 17.30.1023(3) and DEQ Form 1.

¶44 DEQ's April 29, 2014 notice of application deficiencies and its Director's subsequent inquiry of Foss, clearly manifest that DEQ was aware of the standard requirement that a MGWPCS application identify the actual owner or operator of the subject facility responsible for the contemplated wastewater discharge. DEQ must "issue, suspend, revoke, modify, or deny permits to discharge sewage . . . into state waters . . . *consistently with* [BER] *rules*." Section 75-5-402(1), MCA (emphasis added). Why or on what basis DEQ acquiesced to Foss' refusal to identify the actual contemplated owner or operator of the facility is unclear from the record on appeal. Regardless, we hold that, as implemented by DEQ Form 1 (Ver. 1.2 – Rev. 5/12), Admin. R. M. 17.30.1023(3) and .1024(1), requires DEQ to identify the actual owner or operator of the contemplated facility for which an applicant seeks the subject wastewater discharge permit.[10] We will affirm a district court ruling that reaches the right result even if for the wrong reason. *Earth Resources Ltd. Partnership v. North Blaine Estates, Inc.*, 1998 MT 254, ¶ 29, 291 Mont. 216, 967 P.2d 376. For the foregoing reasons, we affirm the District Court's summary

---

[10] Except as otherwise warranted upon balancing of Montana Constitution, Article II, Sections 9 and 10 (public's right to know and right to individual privacy), this information "is a matter of public record and open to public use." Section 75-5-105, MCA.

judgment that DEQ must identify and disclose the actual contemplated owner or operator of the facility for which the applicant seeks the subject wastewater discharge permit.

## CONCLUSION

¶45 We hereby reverse the District Court's summary judgment that DEQ violated MEPA, in contravention of Admin. R. M. 17.4.609(3)(d) and (e), by failing to further consider environmental impacts of the construction and operation of the facility other than water quality impacts and impacts of the related construction of the required wastewater treatment system. We further hereby affirm the District Court's summary judgment that DEQ must identify and disclose the actual contemplated owner or operator of the subject retail store facility.

/S/ DIRK M. SANDEFUR

We concur:

/S/ MIKE McGRATH
/S/ LAURIE McKINNON
/S/ MICHAEL E WHEAT
/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA
/S/ JIM RICE