Justice Ingrid Gustafson delivered the Opinion of the Court.
***339 ¶1 Plaintiff Ronis Bollinger (Bollinger) appeals from the order of the Twenty-Second Judicial District Court, Stillwater County, affirming the Montana Department of Labor and Industry's Human Rights Bureau's (HRB) Hearing Officer Decision and Notice of Issuance of Administrative Decision (Decision), which concluded Bollinger was properly terminated from her employment with the Billings Clinic (the Clinic). We affirm.
¶2 We restate the issues on appeal as:
I. Whether the District Court erred in upholding the Human Rights Bureau's decision that Bollinger was properly terminated by the Clinic.
II. Whether the District Court erred in upholding the Human Rights Bureau's denial of Bollinger's motion to compel Clinic production of certain emails.
III. Whether the District Court erred in awarding costs to the Clinic.
***340 FACTUAL AND PROCEDURAL BACKGROUND
¶3 Bollinger is a registered nurse with over 40 years of experience, more than 15 years of which were at the Clinic. In 1998, 2002, and 2012, Bollinger signed then-current versions of the Clinic's Confidentiality Policy and Agreement, agreeing she would guard and treat as confidential all information pertaining to patients, she would access patient information only on a need-to-know-for-job-functions basis, and the Clinic could discipline or discharge her if she did not comply with this policy.
¶4 The first decade of Bollinger's employment at the Clinic went smoothly. From 1998 until 2008, Bollinger had one write-up, but no other disciplinary action. In 2008, Bollinger's coworker C.K. experienced a privacy breach when another employee logged into the Clinic's patient database to look at C.K.'s personal medical records without a need-to-know-for-job-function basis. When the Clinic initially learned about the possible patient privacy breach, the Director of Nursing attended a meeting, which Bollinger also attended, to advise employees there may have been a privacy breach, and to caution employees not to discuss the matter amongst themselves. During its investigation of the possible privacy breach, Human Resources (HR) interviewed Bollinger about the matter, and Bollinger asserts she became an unwilling *888 witness against the Clinic.[1] However, the Clinic concluded Bollinger had no relevant information about the matter. After the interview, HR again advised Bollinger not to discuss the matter with anyone other than her immediate supervisor.
¶5 In January 2009, the Clinic learned that Bollinger had spoken to a coworker about the C.K. matter. HR again advised Bollinger not to discuss it. Two days later, the Clinic learned that Bollinger had again discussed the C.K. matter, this time over the telephone. HR met with Bollinger again. Bollinger admitted discussing the C.K. matter, even though HR had repeatedly advised her not to do so. Bollinger believes HR harassed and bullied her during these encounters.
¶6 The Clinic took Bollinger's failure to follow direct orders seriously, placing her on administrative leave and advising her it would place a disciplinary letter in her file. Bollinger then filed a retaliation complaint with the United States Department of Health and Human Services Office of Civil Rights (OCR), asserting the Clinic retaliated against her by harassing her, placing her on administrative leave, and ***341 issuing her a disciplinary letter because of her participation as a witness in the C.K. matter.[2]
¶7 Prior to the C.K. matter, the Clinic had usually scheduled Bollinger's work shifts so that she received two consecutive days off each week. After this conflict arose, the Clinic increasingly scheduled her with non-consecutive days off. Bollinger, who had become increasingly distrustful of the Clinic, believed the scheduling change was intentional. Because she had relied on the two consecutive days off to address health concerns, she requested an accommodation to her work schedule to be given Monday and Tuesday off on a regular basis. After providing a doctor's verification of her need for this accommodation, the Clinic agreed to accommodate her request to have two consecutive days off each week. The Clinic indicated the two consecutive days off would usually be Monday and Tuesday, but would occasionally be other days. Bollinger agreed, and the Clinic drafted a memorandum to that effect. Bollinger believed the Clinic failed to honor this agreement and did so deliberately out of hostility toward her because of the C.K. matter and her accommodation request.
¶8 On October 31, 2012, Bollinger filed an administrative complaint against the Clinic with the HRB, alleging disability discrimination and failure to accommodate. Thereafter, Bollinger became increasingly suspicious of her superiors and believed they were plotting against her. Because she believed her career was in jeopardy, she kept track of any injustices she perceived in her scheduling.
¶9 On January 18, 2013, Bollinger was assigned what she believed was a challenging day of multiple surgeries with a demanding surgeon. Bollinger believed the nurse assigned to work with her on this shift was inexperienced, making the day more difficult. Bollinger did not have any lunch-break relief assigned. She feared she would be unable to take a break as she was worried about leaving the inexperienced nurse alone, but she also had concerns about whether she herself could safely work the shift without a break. She considered this a patient safety concern.
¶10 Bollinger took the surgery schedule-which contained confidential patient information-to her direct supervisor to discuss the schedule and her concerns. Bollinger testified her supervisor refused to discuss the schedule and referred her to HR. Contrarily, Bollinger's supervisor denied Bollinger tried to discuss the schedule, testifying she would ***342 have discussed the schedule with Bollinger and she would never have told Bollinger to take the schedule to HR due to confidentiality issues.
¶11 At the end of her shift, Bollinger retained a copy of the surgery schedule instead of leaving it for shredding as required by Clinic policy. Believing the conflict she perceived between the Clinic and herself had escalated to the point where patient safety might be in jeopardy, and to support her *889 pending HRB complaint, Bollinger gave the surgery schedule to her attorney and retained a copy for herself. Thereafter, her attorney provided a copy of the surgery schedule with patient information redacted to the HRB investigator. The HRB sent a copy of the redacted schedule it received from Bollinger's attorney to the Clinic.
¶12 Bollinger continued to raise concerns about the surgery schedule with Clinic management. Bollinger went to the supervisor in charge of her scheduling, who Bollinger claims told her to talk to Ellen James in HR. Contrary to the Clinic's policies regarding patient privacy, Bollinger took her copy of the January 18, 2013 surgery schedule to James. Due to confidentiality issues, James refused to read the surgery schedule and refused to discuss Bollinger's concerns. Bollinger testified that she shredded her copy of the schedule after that meeting.
¶13 James reported the incident to the Clinic management. Prompted by James's report and the Clinic's receipt of the redacted surgery schedule from the HRB, the Clinic investigated Bollinger's removal of the surgery schedule.
¶14 During this time, Bollinger received some write-ups for seemingly trivial matters, allegedly contributing to a "disruptive work environment" by writing an email in all caps, and being "disruptive" by crying outside of an operating room. This discipline was later removed from her personnel file after her union filed an Unfair Labor Practices claim on her behalf.[3]
¶15 On April 3, 2013, Bollinger was called to a meeting with Corporate Compliance, her immediate supervisor, and James regarding removing the surgery schedule and showing it to James. Bollinger denied providing the schedule to anyone other than James and denied removing it from the Clinic's premises. Bollinger testified she denied removing the schedule from the premises and providing it to anyone other than James because she was terrified she would be fired.
¶16 On April 26, 2013, Bollinger met with the Vice President of ***343 Hospital Operations/Chief Nursing Officer (VP), James, and Bollinger's nurse union representative. The VP asked Bollinger if she had ever taken a surgery schedule out of the Clinic. Bollinger admitted removing the schedule and giving it to her attorney. Bollinger acknowledged she had previously lied to Corporate Compliance. The VP asked Bollinger why she had lied and Bollinger claimed she had difficulty understanding Corporate Compliance's questions. The VP reviewed the questions Corporate Compliance previously asked to determine what, if anything, was confusing and Bollinger failed to articulate any instances of confusion with the questions. The VP again asked Bollinger why she had not told Corporate Compliance the truth and Bollinger replied that she was not thinking. The VP then terminated Bollinger's employment for violating the Clinic's policies by removing the surgery schedule and for lying about the removal to investigators.
¶17 After the Clinic terminated Bollinger's employment, she filed an administrative complaint against the Clinic with the HRB, alleging the Clinic violated the MHRA by retaliating against her for engaging in protected activity. In this complaint, Bollinger alleged the Clinic terminated her employment in retaliation for filing the October 31, 2012 HRB Complaint.[4] In this new complaint, which is the subject of the present appeal, Bollinger asserted her history of discipline and investigative interactions with the Clinic demonstrated a retaliatory motive that caused or contributed to its decision to terminate her employment.
¶18 On December 23, 2013, the HRB issued a "no reasonable cause" finding of retaliation. Bollinger appealed the finding to the Human Rights Commission (HRC). The HRC reversed the no-cause finding and allowed Bollinger's complaint to proceed to a contested case hearing.
¶19 Bollinger moved the HRB to compel discovery of various Clinic emails from June 6, 2014 to September 27, 2012. The Clinic *890 asserted privilege based on attorney-client privilege and attorney work-product and submitted a Privilege Log. The Hearing Officer denied the motion.
¶20 Following the hearing, the HRB Hearing Officer issued a detailed Decision upholding the termination concluding Bollinger failed to prove retaliation. The Hearing Officer did note that some of the Clinic's actions were suspect, including the "curious disciplinary action" it took against Bollinger for writing an all-caps email and crying at work.
***344 However, the Hearing Officer also noted that no witnesses were able to corroborate Bollinger's accounts of being harassed and bullied during the investigation into the C.K. matter, and while he found Bollinger sincere in her belief that the Clinic treated her unfavorably, he did not find those beliefs credible, concluding she "did not prove her feelings about those interviews and meetings were reasonably based on what actually took place during them." The Hearing Officer further found that Bollinger found evidence of plots against her in "innocuous events."
¶21 With regard to Bollinger's work schedule accommodation request, the Hearing Officer similarly found Bollinger's belief that the Clinic intentionally scheduled her days off in violation of their agreement to be unfounded. He concluded that "there is substantial and credible evidence that the Clinic did honor the accommodation.... Bollinger was not assigned every Monday and Tuesday off.... But more likely than not, the Clinic made a good faith effort to provide the accommodation to which it had agreed."
¶22 The Hearing Officer determined the Clinic's bases for terminating Bollinger's employment all pertained to Bollinger's actions regarding the surgery schedule, specifically: violating the Clinic's policies by removing a surgery schedule containing confidential patient health information; violating the Clinic's policies by providing that document to her lawyer, who she knew would supply it to the HRB investigator; violating the Clinic's policies and compromising patients' protected health information by showing the surgery schedule to James, who did not have a need-to-know-for-job-functions basis to see it; and, most importantly, lying about removing the surgery schedule during the Clinic's internal investigation. Although Bollinger asserted removing the surgery schedule from the Clinic was itself protected activity, the Hearing Officer disagreed, concluding, "violating privacy policies and putting patient information at risk of disclosure without patient knowledge or consent was not protected activity." He further found Bollinger's argument that the schedule proved retaliatory treatment implausible.
¶23 Finally, the Hearing Officer found Bollinger was not discharged due to participation in any other asserted protected activity. The Hearing Officer concluded Bollinger's evidence was insufficient to establish the Clinic took any adverse employment actions against her for retaliatory reasons after she engaged in protected activities with her accommodation request. The Hearing Officer found Bollinger's beliefs were outweighed by the substantial evidence the Clinic presented and that it had legitimate business reasons for its actual ***345 adverse employment actions, despite Bollinger's assertion that earlier conflicts with the Clinic-her 2012 HRB complaint, prior Unfair Labor Practices claims, OCR complaint, and her participation in the C.K. matter-played a role in the Clinic's decision to discharge her.
¶24 Bollinger appealed the Decision to the HRC. The HRC issued a Final Agency Decision affirming the Decision.[5] Bollinger then appealed to the District Court, which appointed a Standing Master to hear the appeal. The Standing Master affirmed the Final Agency Decision. Bollinger objected to the Standing Master's ruling. On January 24, 2018, the District Court issued an Order on Petition for Judicial Review affirming the Hearing Officer's Decision.
¶25 Thereafter, the Clinic gave notice it would request recovery of costs as the prevailing party. After briefing on the cost issue, the court assessed $9,370.59 in costs against Bollinger. This appeal followed.
*891 STANDARD OF REVIEW
¶26 The Montana Administrative Procedures Act (MAPA) governs actions before the HRC. Section 2-4-704(2), MCA, provides the standard of judicial review of agency decisions:
The court may not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because:
(a) the administrative findings, inferences, conclusions, or decision are:
(i) in violation of constitutional or statutory provisions;
(ii) in excess of the statutory authority of the agency;
(iii) made upon unlawful procedure;
(iv) affected by other error of law;
(v) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record;
(vi) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
Under this standard of review, which applies to both the district court's review of the agency decision and this Court's review of the district ***346 court's decision, a reviewing court may not substitute its judgment for that of the administrative agency, but instead reviews the whole record to determine if the agency's findings of fact are clearly erroneous and its determinations of law are correct. A finding is deemed clearly erroneous if it is not supported by substantial evidence, if the agency misapprehended the effect of evidence, or if this Court's review of the record convinces us a mistake has been made. Jones v. All Star Painting Inc. , 2018 MT 70, ¶ 14, 391 Mont. 120, 415 P.3d 986.
¶27 Whether a party is entitled to costs is a question of law we review for correctness, and we review an order concerning costs for abuse of discretion. Davis v. Jefferson Cty. Election Office , 2018 MT 32, ¶ 9, 390 Mont. 280, 412 P.3d 1048. We review a district court's discovery rulings for abuse of discretion. Daley v. Burlington Northern Santa Fe Ry. , 2018 MT 197, ¶ 3, 392 Mont. 311, 425 P.3d 669.
DISCUSSION
¶28 I. Whether the District Court erred in upholding the Human Rights Bureau's decision that Bollinger was properly terminated by the Clinic.
¶29 To establish a retaliation claim under the MHRA, the employee must first establish a prima facie case by showing: 1) she engaged in protected activity; 2) she suffered an adverse employment action; and 3) there is a causal connection between the protected activity and the adverse action. Rolison v. Bozeman Deaconess Health Servs., Inc. , 2005 MT 95, ¶17, 326 Mont. 491, 111 P.3d 202. Once the employee establishes a prima facie case, the burden shifts to the employer to articulate legitimate, non-discriminatory reasons for the discharge. Rolison, ¶ 16. Once the employer articulates these reasons, the burden shifts back to the employee to demonstrate the articulated reasons are a pretext for retaliation. Rolison , ¶ 16. To establish pretext, the employee must show that a retaliatory reason motivated the employer to discharge the employee, or that the employer's reasons for discharging the employee are completely "unworthy of credence." Villiarimo v. Aloha Island Air, Inc ., 281 F.3d 1054, 1063 (9th Cir. 2002). Admin. R. Mont. 24.9.603(1) defines protected activity under the MHRA:
"Protected activity" means the exercise of rights under the act or code and may include:
(a) aiding or encouraging others in the exercise of rights under the act or code;
(b) opposing any act or practice made unlawful by the act or code; and ***347 (c) filing a charge, testifying, assisting or participating in any manner in an investigation, proceeding or hearing to enforce any provision of the act or code.
¶30 The Hearing Officer concluded Bollinger established a prima facie claim of retaliation, but the Clinic articulated legitimate, non-retaliatory reasons for Bollinger's *892 discharge-namely removal of the surgery schedule from Clinic premises in violation of the Clinic's policies and practices and lying during the Clinic's internal investigation into the removal of the surgery schedule-and Bollinger failed to establish pretext or the Clinic's reasons for her termination were false.
¶31 Bollinger asserts the District Court erred in upholding the HRB Decision. Specifically, she maintains the Hearing Officer erred in determining the Clinic articulated a legitimate, non-retaliatory reason for her termination when it allegedly honored its obligation to discipline employees for confidentiality breaches and ignored her asserted concerns for patient safety related to the surgery schedule. Bollinger also asserts the Hearing Officer erred when it concluded she failed to establish pretext or that the Clinic's reasons for her termination were false. She argues it incorrectly concluded her labor practices complaints and her OCR complaint did not involve violations of rights protected by the MHRA, and it disregarded the significance of her participation in the C.K. matter. The Clinic counters the Hearing Officer correctly concluded Bollinger failed to establish pretext and failed to demonstrate the Clinic's reasons for discharging her were "unworthy of credence." The Clinic argues Bollinger admitted both the misconduct that led to her discharge and the reasons for her discharge were true.
¶32 We agree that under some circumstances, prior discipline and investigative interactions between an employer and employee may constitute protected activity and provide evidence of a retaliatory motive for an adverse employment action. We also agree that under some circumstances, removal of a document containing confidential or sensitive health information in violation of an employer's policies may constitute protected activity. However, we do not agree with Bollinger that such circumstances exist here and we need make no ruling on these asserted issues under the facts of this case because the record contains substantial credible evidence the Clinic properly terminated Bollinger's employment for her lying during the Clinic's internal investigation.
¶33 Bollinger admitted she lied about removing the schedule because she feared the consequences of removal. The Hearing Officer did not ***348 misapprehend the effect of this evidence. From our review of the record, the District Court did not err in upholding the Hearing Officer's conclusion that the Clinic articulated legitimate, non-retaliatory reasons for Bollinger's termination, including Bollinger's dishonesty and removal of the surgery schedule. We recognize not every instance of lying to one's employer, even if not protected activity, is a sufficient offense to warrant termination. Here, however, Bollinger's lying justified her termination. Bollinger lied about removing a document containing confidential, sensitive, and protected health information. The privacy breach placed potential liability on the Clinic. Bollinger's lying interfered with the Clinic's ability to determine the magnitude of the breach and to determine what, if any, action it needed to take regarding patient notification. It prolonged the investigation, required additional Clinic time and resources and raised the possibility another person could get blamed for the privacy breach. As meticulously analyzed by the Hearing Officer, Bollinger's termination was consistent with personnel actions taken against other Clinic employees who engaged in privacy breaches and were dishonest in the Clinic's investigation thereof. We conclude Bollinger's lying to the Clinic during its internal investigation was in and of itself sufficient evidence to support her termination from employment. Thus, the Clinic's reasons for discharging Bollinger are not completely "unworthy of credence."
¶34 From our review of the record, we are not convinced a mistake has been made. Regardless of whether her prior discipline and investigative interactions with the Clinic or her removal of the surgery schedule were protected activities, the District Court did not err in upholding the Hearing Officer's conclusion that Bollinger was properly terminated by the Clinic for her dishonesty.
¶35 II. Whether the District Court erred in upholding the Human Rights Bureau's denial of Bollinger's motion to compel Clinic production of certain emails.
¶36 Next, Bollinger argues the District Court erred in affirming the Hearing *893 Officer's denial to order the Clinic to produce approximately 600 emails the Clinic claimed were protected by attorney-client privilege and attorney work-product doctrine. In support of its assertion of privilege, the Clinic submitted a detailed, 47-page Privilege Log. Bollinger asserts many of the emails involve exchanges between individuals who are not attorneys. She further asserts these emails involve the Clinic's internal investigation and business matters which would help establish her retaliation claim. In reviewing the Hearing Officer's determination on this issue, the District Court found that "[a]fter a rather exhaustive review of its own, the Court concludes ***349 that more discovery would not produce a 'smoking gun' nor shed additional light on the issues before the Court."
¶37 Neither party argues the emails pertain to whether Bollinger lied to the Clinic, or admitted to lying to the Clinic, about removing the surgery schedule during the Clinic's internal investigation. As we have determined, Bollinger was properly terminated by the Clinic for lying during an internal investigation. These emails would not affect the outcome of this case, even if the Hearing Officer erred in determining they were all privileged. To the extent any error could be found, it would be harmless error under M. R. Civ. P. 61.[6] Thus, the District Court did not abuse its discretion in upholding the Hearing Officer's denial of Bollinger's motion to compel further discovery.
¶38 III. Whether the District Court erred in awarding costs to the Clinic.
¶39 Finally, Bollinger argues the District Court erred in awarding discretionary costs of $9,370.59 to the Clinic pursuant to § 49-2-505(8), MCA. Bollinger argues an award of costs is not appropriate because it could dissuade other plaintiffs from bringing meritorious human-rights suits. Alternatively, Bollinger asserts that if costs are awarded, the only allowable costs are $85.00 in filing fees and a reasonable fee for Bollinger's deposition costs. Bollinger asserts the District Court abused its discretion in awarding costs for the Moline deposition subpoena fee; deposition witness fees for Hauschild and Moline; deposition transcript fees of Hauschild and Moline; the hearing transcript fee; the deposition transcript fee of Bollinger's deposition; hearing room costs; and postage fees. The Clinic asserts the District Court thoroughly analyzed the Clinic's requested costs of $21,989.81 and the cost issues raised by Bollinger, and its award of $9,370.59 in costs to the Clinic does not demonstrate an abuse of discretion. We agree.
¶40 The District Court correctly concluded § 49-2-505(8), MCA, governs its consideration of costs, giving it discretion to award the prevailing party reasonable costs. It may also award costs under § 25-10-101, MCA, et seq. to the prevailing party in a claim brought under the MHRA. Rolison , ¶ 38. The District Court thoroughly considered the costs asserted by the Clinic and Bollinger's objections thereto, specifically addressing filing fees, subpoena fees, transcript fees, ***350 witness fees, postage fees, and deposition fees-including those specifically related to Hauschild, Miller, Moline and Bollinger-and it provided a detailed basis for the legal and factual authority supporting the costs it awarded. From our review of the record, we conclude the District Court was correct in its legal analysis and did not abuse its discretion in its factual analysis of the cost award.
CONCLUSION
¶41 The District Court did not err in upholding Bollinger's termination from employment because she failed to demonstrate the Clinic retaliated against her for engaging in protected activity. Further, the District Court did not abuse its discretion in upholding the Hearing Officer's denial of Bollinger's discovery request as there is no indication the emails would provide any relevant information regarding the Clinic's termination of her employment for lying, and thus any error in denying production was harmless. The District Court correctly awarded costs to the *894 Clinic as the prevailing party and did not abuse its discretion in the award amount.
¶42 Affirmed.
We concur:
MIKE McGRATH, C.J.
BETH BAKER, J.
JAMES JEREMIAH SHEA, J.
LAURIE McKINNON, J.
DIRK M. SANDEFUR, J.
JIM RICE, J.

The investigation into this possible privacy breach was not a proceeding under the Montana Human Rights Act (MHRA) nor did it involve rights protected under it.

This proceeding also did not arise under the MHRA and did not involve violations of rights protected under the MHRA.

These matters likewise did not proceed under the MHRA or involve rights protected by it.

The HRB ultimately denied Bollinger's October 31, 2012 administrative complaint and it is not directly at issue here.

Some HRC members opined Bollinger's termination appeared to them to be retaliatory but nevertheless affirmed the Decision as they did not believe the caselaw supported such a legal conclusion.

While in camera review of documents claimed to be protected from production by the attorney-client or attorney work-product doctrines is not necessarily required, a court or hearing officer may need to conduct such review when the privilege log lacks requisite detail for the court to evaluate the claimed privilege.