FILED

03/16/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0071

DA 20-0071

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2021 MT 68

DANIEL G. DEBUFF and SANDRA L. DEBUFF,

        Petitioners and Appellees,

    v.

MONTANA DEPARTMENT OF NATURAL RESOURCES
AND CONSERVATION, an agency of the State of Montana,

        Respondent and Appellant.

APPEAL FROM:    Montana Water Court, Cause No. WC-MAPA-2019-01
                   Honorable Stephen R. Brown, Associate Water Judge, Presiding

COUNSEL OF RECORD:

        For Appellant:

                Barbara L. Chillcott, Brian C. Bramblett, Special Assistant Attorneys General, Montana Department of Natural Resources and Conservation, Helena, Montana

        For Appellees:

                John E. Bloomquist, Bloomquist Law Firm, P.C., Helena, Montana

                           Submitted on Briefs: November 18, 2020

                                   Decided: March 16, 2021

Filed:

                        _____
                                  Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 The Montana Department of Natural Resources and Conservation (DNRC or the Department) appeals from the Order on Petition for Judicial Review entered by the Montana Water Court, reversing DNRC's Final Order and remanding the matter to DNRC for further proceedings. We state the contested issues as follows:

> *Did the Water Court err in its rulings regarding:*
>
> *1. Whether DNRC improperly relied upon either the geologic map or the 1987 Final Order?*
>
> *2. Whether DNRC's determination that the source aquifer was not discontinuous was clearly erroneous?*
>
> *3. Whether DNRC's failure to consider evapotranspiration evidence provided by DeBuff was arbitrary and capricious?*
>
> *4. Whether DNRC's determination that the water was not legally available and would have an adverse effect on senior appropriators was arbitrary and capricious?*

We reverse in part and affirm in part, and conclude that the Water Court correctly remanded the matter to DNRC for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 The real property involved herein is owned by Daniel and Sandra DeBuff (DeBuff). It is an agricultural property located south of the Big Snowy Mountains within hydrologic Basin 40A, situated in Section 35, Township 10 North, Range 17 East, Wheatland County. Topographically, the property generally slopes from north to south. There are several sets of springs on the DeBuff property. Living Springs flows into a wetland complex, and does not connect to any other surface water feature, save for the occasional storm or runoff

2

event. There are four other springs, three of which are on DeBuff property and a fourth on a neighboring parcel, which are collectively referred to informally as the "southern springs." South of the southern springs is Elk Creek, which is subject to the water rights of several third parties.

¶3 DeBuff proposes to divert groundwater by means of four wells on their property and a groundwater pit, with the wells discharging water into the pit to create a water storage unit with an approximate capacity of 19.5 acre-feet, which is designed to be pumped to a center pivot irrigation system. The wells are sourced by shallow groundwater from an unconfined gravel and sand aquifer system. According to Dr. Willis Weight, an engineer and hydrogeologist, and consultant for DeBuff, the aquifer is recharged from melt-off from the Big Snowy Mountains to the north, and thins or "pinches out" as it flows to the south. The proposed period of diversion for the project would be annually, between April 20 and October 10, for irrigation purposes.

¶4 In 1984, DeBuff applied with DNRC for a water use permit to appropriate ground water from the source aquifer. A contested hearing was held, after which the application was denied in the 1987 Final Order, wherein DNRC determined DeBuff had failed to prove that the water rights of senior appropriators downstream to the source aquifer would not be adversely affected by the proposed appropriation. DNRC dismissed the application without prejudice to a reapplication by DeBuff should sufficient evidence become available to satisfy the burden of proof regarding adverse impacts to senior appropriators.

3

¶5     Beginning in November 2013, Weight conducted a series of assessments to examine the feasibility of DeBuff's proposed appropriation.  A preliminary aquifer test was conducted that consisted of a 74-hour pumping test at 160 gallons per minute, resulting in a cone of depression in the aquifer water levels that extended up to 1,800 feet.  Another 74-hour pumping test was conducted in September 2014 at a rate of 425 gallons per minute, resulting in a cone of depression of up to 2,000 feet, although full recovery was realized in less than four hours.  During the second test, a gauge installed on one of the southern springs indicated no response or impact from the water draw.  A third test conducted in the fall of 2015 yielded similar results.

¶6     At a pre-application, on-site meeting with DeBuff and their consultants, DNRC approved DeBuff's proposal to conduct a subsequent four-well aquifer test, agreeing that the September 2014 test would be suitable to assess aquifer properties, while the following test would be used to further assess the impacts of pumping.  In November 2015, an 88-hour pump test was conducted to evaluate pumping productivity of the aquifer, with an average pumping rate of 1,491 gallons per minute, resulting in a cone of depression of 2,700 feet.  This pump test also analyzed the drawdown of five separate wells.  From this test, Weight concluded that, since the nearest property line was 2,900 feet away, the cone of depression was unlikely to extend beyond DeBuff's property line.  Though the proposed testing had been initially approved by DNRC, in a December 2015 variance letter the agency expressed concern that any analysis with as many as five pumping wells would make it difficult to provide the necessary controls to properly evaluate aquifer properties.

¶7    In February 2016, DeBuff submitted a renewed application for a beneficial water use permit to DNRC's Lewistown Water Resource Regional Office. As initially filed, DeBuff proposed an appropriation of 3.63 cubic feet per second and a volume of 552.69 acre-feet for the purpose of irrigating 267 acres of DeBuff's property. In August 2018, Douglas Mann, who, along with Atilla Folnagy, processed the application for DNRC, delivered a deficiency letter to DeBuff pursuant to § 85-2-302(5), MCA, stating concerns about the impact the project would have on Elk Creek, situated south of DeBuff's property. DNRC believed Elk Creek was connected to and supplied by a northern water source, Timber Creek. Weight and DeBuff responded to the deficiency letter, indicating that Elk Creek was not connected to any northern source and was ephemeral, and that the northern source identified by DNRC ran dry on DeBuff's property. Weight also stated for the first time that evapotranspiration analysis would be appropriate in this situation and that he would conduct such analysis in the event that the application was deemed correct and complete by DNRC.[1,2]

¶8    In January 2017, DNRC issued a report addressing the additional information supplied by DeBuff and Weight. The report stated the proposed evapotranspiration

---

[1] Evapotranspiration is a process resulting in the loss of water from the soil both by evaporation and by transpiration from the plants growing thereon. *Merriam-Webster's Collegiate Dictionary* 432 (Frederick C. Mish ed., 11th ed. 2012). As used in water proceedings, evapotranspiration measures the water that would potentially be captured by avoiding the losses from these natural processes when water is instead applied to a beneficial use.

[2] In his response to DNRC, Weight referenced and incorporated the geologic map that would become an issue herein, and referenced it multiple other times while corresponding with DeBuff and DNRC. DNRC also regularly referenced the geologic map in its correspondence.

analysis may not be reliable because it would address conditions unrelated to pumping, and that Weight's conceptual model depicting the aquifer as confined was questionable because it was based on limited well logs.

¶9 DNRC determined the application to be correct and complete and issued a technical report in March 2017. The technical report, which incorporated an aquifer test report and depletion report prepared by DNRC staff hydrologists, examined water availability from two vantage points: ground water and surface water. The report determined groundwater to be both physically and legally available. However, the report determined that surface water was physically and legally available only during certain months, rather than annually. Monthly watershed yield, which impacts water availability, was estimated by DNRC at this time using the Thornthwaite program, a software analysis tool, despite DNRC acknowledging that portions of the program's conclusions were "very unlikely."

¶10 In April 2017, DeBuff submitted additional information regarding surface level depletion of the southern "Bunkhouse" well that indicated the aquifer thinned or pinched out, and was discontinuous. At a meeting of the parties in June 2017, Weight presented a conceptual model that illustrated the pinching out of the source aquifer. In order to satisfy DNRC's concern that the conceptual model was not supported by enough field data, the model was supported not only by the prior pump test and well log data that DNRC had questioned as insufficient, but by additional well log information gathered in July 2016.

¶11 In November 2017, DNRC issued a revised technical report that incorporated portions of DeBuff's additional evidence and analysis. The revised technical report

6

conceded that DeBuff's analysis correctly determined that the aquifer thinned or pinched out, and, consequently, a different net depletion method than used in the prior depletion report would need to be employed. However, DNRC stated that the pinching out did not mean that the aquifer was discontinuous. Instead, DNRC continued to rely on a prior determination it had made, based upon an analysis of shade contrasts in aerial photos, that the source aquifer was continuous to the southern springs. DNRC also conceded that DeBuff had demonstrated the drainage south of Living Springs was ephemeral, but that, instead, it now believed the southern springs to be the source for Elk Creek and related downstream water rights. The revised report expressed concern that, while depletion to Living Springs would be realized within the same month as the pumping occurred, depletion of the southern springs and to their respective reaches—which DNRC now characterized as the source aquifer for Elk Creek—would be more difficult to gauge, due to the greater distance to the southern springs, and was "assumed to be constant year-round depletion." Lastly, the revised report conceded that the watershed analysis previously employed and relied on by DNRC—figures deriving from the Thornthwaite program— was "not appropriate for comparing legal availability of surface water" because it had determined that the Elk Creek drainage was not intermittent, rendering any figures that

7

relied upon the original analysis, including DeBuff's evapotranspiration analysis, to be inaccurate.[3, 4]

¶12 On December 14, 2017, the parties met to discuss the revised technical report and DNRC's new focus on the southern springs. Based on these discussions, Weight provided additional information for the purpose of demonstrating the source aquifer for the proposal was not connected to the southern springs. Even so, Weight additionally proposed a water budget analysis that would apply two of DeBuff's *existing* water rights for mitigation purposes against the projected depletion by the new application. Weight also proposed incorporating an evapotranspiration analysis to balance out anticipated depletions to the southern springs. Thus, while continuing to maintain DeBuff's proposed use would not draw from the source aquifer of the southern springs, DeBuff nonetheless offered mitigation against such depletion by dedication of two of their existing water rights.

¶13 The proposed water balance was evaluated by DNRC and, in a January 23, 2018 memorandum, the Department reached a general conclusion that the application still did

---

[3] "Technical reports," "aquifer reports," and "depletion reports" are part of DNRC's agency nomenclature, but these names are not defined by statute or administrative rules. The reports are prepared by DNRC staff as part of the Department's internal review process, and frequently are individual parts of an overall report.

[4] Throughout the proceeding, DNRC staff used the Thornthwaite Method, applying its findings to both the watershed yield and evapotranspiration analysis. In contrast, Weight employed the Penman Method, which DNRC eventually conceded in the second technical report was the superior analytical approach. *See Citizens for Ground Water Prot. v. Porter*, 275 S.W.3d 329, 341 (Mo. 2008) (stating that the Penman Method of evapotranspiration analysis "is generally accepted in the irrigation industry[,] as opposed to the Thornthwaite method . . . which is not generally accepted nor endorsed").

not sufficiently mitigate depletion of the southern springs. Unexpectantly, DNRC's assessment of Weight's evapotranspiration analysis concluded it would actually mitigate a greater loss than Weight had suggested, specifically, an estimated 230.8 acre-feet annually from the Living Springs wetland area. However, while DNRC did not identify problems with the use of evapotranspiration methodology, it nonetheless concluded a consumption volume of 137.5 acre-feet would still be left unmitigated. It therefore concluded that a downward adjustment to the volume requested in DeBuff's application would be necessary before evapotranspiration methodology could be applied, and that other practical problems with the water budget offsets remained.

¶14 Consequently, in response to DNRC's conclusions, and following further discussions between the parties, DeBuff decided to submit an amended application that would significantly reduce the size of his proposed use and cover DNRC's depletion calculation. On March 5, 2018, DeBuff submitted an amended application, reducing the proposed flow rate from 3.63 to 2.38 cubic feet per second, the volume from 552.69 to 216.4 acre-feet, and the irrigated area from 267 to 173.1 acres. The flow rate was later clarified by Pat Riley, another consultant for DeBuff, to be 2.43 cubic feet per second. This downsizing of the proposal placed the application's estimated acre-feet use below the estimated total amount of water that would be saved under the evapotranspiration analysis, and thus satisfied DNRC's estimate that 137.5 acre-feet would be unmitigated under the original application, reaching zero net depletion to downgradient surface water.

9

¶15 On April 16, 2018, DNRC determined DeBuff's amended application was correct and complete. On April 18, 2018, DNRC issued a third revised technical report. The third revision incorporated a revised aquifer test report and revised depletion report that referenced the 1987 Final Order when noting that "[n]o additional information has been provided to [DNRC] in this application regarding the estimated flows/volume emanating from the Southern Springs other than a single measurement during the previous application process (1987)." However, despite the parties' lengthy application of evapotranspiration analysis throughout the process, following which DeBuff submitted the amended application premised thereon, DNRC neither analyzed evapotranspiration in the report nor explained why it suddenly abandoned the analysis. In response, on May 17, 2018, DeBuff, through Weight, sent a letter to DNRC pointing out the need for evapotranspiration analysis, and again providing a summary of its impact on the application. DNRC reviewed the letter, but declined to alter its conclusions.

¶16 On August 14, 2018, Scott Irvin, manager of the Lewistown Water Resources Regional Office, issued the Preliminary Determination (PD) denying DeBuff's amended application. Irvin based his decision on DNRC's determination that DeBuff had failed to prove by a preponderance of the evidence that the "surface water [was] legally available from the Southern Springs discharge point and downgradient in the Elk Creek drainage, nor [had] they proven adverse effects would not result to water users in that drainage."

¶17 The PD acknowledged Weight's opinion about the nature of the aquifer, but credited DNRC's view that, despite pinching out, the aquifer was hydraulically connected to the

southern springs. The PD relied heavily upon the opinion of DNRC staff that, because there was "no mapped bedrock feature (e.g. no flow boundary) that would prevent depletions to the Southern Springs[,]" depletions of surface water at Living Springs would "ultimately manifest to the Southern Springs . . . and further downstream to the Elk Creek drainage[.]" Notably, and consistent with DNRC's revised technical report, the PD did not discuss evapotranspiration analysis and its effect on the application—either as conducted by Weight or by DNRC hydrologists—nor did it explain why it was failing to do so after the analysis had played a significant role during the administrative process. The PD referenced and incorporated facts from the 1987 Final Order, noting DNRC's hydraulic connection analysis's consistency with that done in 1987.

¶18 Objecting to the PD, DeBuff requested a show cause hearing, which was conducted on November 1, 2018. DeBuff was given the opportunity therein to show cause why the application should be approved. DNRC presented no case. DeBuff provided, among other documents, a copy of the 1987 Final Order, as well as flow measurements from two of the southern springs taken in the summer of 2018. DeBuff offered the testimony of Weight and Riley, and also examined Folnagy and Mann. While being examined by counsel for DeBuff, Folnagy acknowledged the evapotranspiration analysis conducted by Weight but explained he determined not to discuss it in his reports because he did not believe DeBuff had demonstrated an appropriate basis for evapotranspiration analysis to be considered. Mann testified there was no continuous flow between the Living Springs and the southern springs, making watershed analysis inapplicable.

11

¶19 On January 28, 2019, the Hearing Examiner issued a Final Order on behalf of DNRC that upheld the PD's denial of DeBuff's amended application. The Final Order adopted substantial portions of the PD and made additional findings regarding legal availability and adverse effect. The Hearing Officer affirmed the Department's determination that DeBuff had failed to prove legal availability and lack of adverse effect on senior appropriators by a preponderance of the evidence. The Final Order did not address either the water balance proposal DeBuff had submitted in consultation with DNRC, or the evapotranspiration analysis offered by DeBuff to mitigate DNRC's concern about depletion.

¶20 In February 2019, DeBuff filed a Petition for Judicial Review with the Water Court. After briefing, the Water Court heard oral argument on August 22, 2019. On November 21, 2019, the Water Court entered judgment in favor of DeBuff, reversing DNRC's Final Order and remanding with instructions to enter a modified Preliminary Determination consistent with the Water Court's decision, which allowed DeBuff's amended application to proceed to the notice stage of the process, and opportunity for objections by affected water users, as more fully discussed herein.

¶21 The Water Court held, first, that DNRC improperly relied on a map that was not properly made a part of the record, resulting in an erroneous determination by DNRC that the source aquifer was hydrologically connected to the southern springs. Second, the Water Court concluded DNRC's reliance on facts gleaned from the 1987 Final Order was improper, resulting in a decision that was procedurally flawed. Third, the Water Court concluded the Final Order's rejection of the watershed yield analysis was arbitrary and

capricious.  Fourth, the Water Court held DNRC's failure to consider the record evapotranspiration evidence was arbitrary and capricious.  Finally, the Water Court determined DNRC failed to independently evaluate evidence related to use of water rights by senior appropriators as included within the Final Order's determination regarding lack of adverse effect to surface water rights in Elk Creek, concluding this was arbitrary and capricious and an abuse of discretion.  DNRC appeals.

## STANDARD OF REVIEW

¶22    We apply the same standard as the lower court.  *Qwest Corp. v. Mont. Dep't of Pub. Serv. Regulation*, 2007 MT 350, ¶ 15, 340 Mont. 309, 174 P.3d 496 (citing *Montana Power Co. v. Public Service Com'n*, 2001 MT 102, ¶ 18, 305 Mont. 260, 26 P.3d 91).  The Montana Administrative Procedures Act outlines the correct standard of review for judicial review of administrative decisions in contested cases in § 2-4-704, MCA.[5]  Under § 2-4-704(2), MCA, a reviewing court may either affirm or remand a case for further proceedings, but it may not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact in either affirming or remanding a case for further proceedings.  Section 2-4-704(2), MCA.  A reviewing court may reverse or modify the agency decision if substantial rights of a party have been prejudiced because the decision

---

[5] A contested case is "a proceeding before an agency in which a determination of legal rights, duties, or privileges of a party is required by law to be made after the opportunity for hearing." Section 2-4-102(4), MCA.  DNRC's Final Order followed a hearing and effected DeBuff's opportunity to obtain a water permit as well as the rights of senior appropriators.  Therefore, it is within the definition of contested case and subject to the statutory review articulated in § 2-4-704, MCA.

13

violates constitutional or statutory provisions, is based upon unlawful procedure, is clearly erroneous in view of the substantial evidence on the whole record, is arbitrary or capricious, or may be properly characterized as an abuse of discretion. Section 2-4-704(2)(a), MCA.

¶23 "A three-part test is used to determine whether agency findings are clearly erroneous: (1) the record is reviewed to determine if the findings are supported by substantial evidence; (2) if the findings are supported by substantial evidence, it will be determined whether the agency misapprehended the effect of the evidence; and (3) if substantial evidence exists and the effect of the evidence has not been misapprehended, the reviewing court may still decide that a finding is clearly erroneous if a review of the record leaves the court with a definite and firm conviction that a mistake has been made." *Schmidt v. Cook*, 2005 MT 53, ¶ 21, 326 Mont. 202, 108 P.3d 511 (citation omitted).

¶24 An evaluation of a petition for judicial review calls for the Court to review the entire administrative record. *KB Enters., LLC v. Mont. Human Rights Comm'n*, 2019 MT 131, ¶ 6, 396 Mont. 134, 443 P.3d 498 (citing *Bollinger v. Billings Clinic*, 2019 MT 42, ¶ 26, 394 Mont. 338, 434 P.3d 885). In areas that require scientific expertise or are highly technical in nature, we will defer to the expertise of an agency. *Mont. Envtl. Info. Ctr. v. Mont. Dep't of Envtl. Quality*, 2019 MT 213, ¶ 20, 397 Mont. 161, 451 P.3d 493. However, while we acknowledge that this Court is "not comprised of hydrologists, geologists, or engineers, and that protecting the quality of Montana's water requires significant technical and scientific expertise beyond the grasp of the Court[,]" we have been entrusted with an inherent power to review administrative decisions and interpret the law, regardless of the

14

subject of an appeal. *Mont. Envtl. Info. Ctr.*, ¶ 20. As such, we will not afford unfettered deference to agency decisions without a thorough and careful review of the administrative record and defer only to "consistent, rational, and well-supported agency decision-making." *Mont. Envtl. Info. Ctr.*, ¶ 26. This requires that an agency "'cogently explain why it has exercised its discretion in a given manner.'" *Mont. Envtl. Info. Ctr.*, ¶ 97 (quoting *Nat'l Parks Conservation Ass'n v. United States EPA*, 788 F.3d 1134, 1142 (9th Cir. 2015)). Further, we will consider whether an agency decision was based on a consideration of all relevant factors. *Clark Fork Coal. v. Mont. Dep't of Envtl. Quality*, 2008 MT 407, ¶ 21, 347 Mont. 197, 197 P.3d 482.

## DISCUSSION

*Overview*

¶25 DNRC is tasked with "coordinat[ing] the development and use of the water resources of the [S]tate so as to effect full utilization, conservation, and protection of its water resources." Section 85-1-101(3), MCA.[6] As such, DNRC is the agency charged with issuing water use permits and promulgating "suitable rules for the administration" of the Montana Water Use Act. Section 85-1-201, MCA. Except for limited exceptions not applicable here, "a person may not appropriate water or commence construction of diversion, impoundment, withdrawal, or related distribution works unless the person applies for and receives a permit[.]" Section 85-2-302(1), MCA. The application must be

---

[6] We cite to the 2019 version of the statutes as there are no relevant substantive changes between the 2015 and 2019 versions.

on the form prescribed by DNRC. Section 85-2-302(3), MCA. To be approved, the applicant must prove by a preponderance of the evidence that the application satisfies all requirements listed in § 85-2-311, MCA (-311 criteria).

¶26 The -311 criteria are an outline of six broad areas that must be addressed by the applicant: physical availability, legal availability, adverse effect, adequate diversion, beneficial use, and possessory interest. Section 85-2-311, MCA. To satisfy physical availability, the applicant must supply evidence establishing the ground and surface water the applicant is seeking to appropriate is physically available at the proposed point of diversion. Section 85-2-311(1)(a)(i), MCA; Admin. R. M. 36.12.1702, 36.12.1703 (requiring various tests and analyses including streamflow analysis and aquifer testing). [7] Regarding legal availability, the applicant must identify physical water availability and existing legal demands on the source and provide an analysis demonstrating that the proposed appropriation does not and will not exceed the difference between the available water and the existing legal demands. Section 85-2-311(1)(a)(ii), MCA; Admin. R. M. 36.12.1704, 36.12.1705. Under adverse effect, the applicant must show that senior appropriators will not be adversely affected, either qualitatively or quantitatively, by the proposed usage. Section 85-2-311(1)(b), (f), MCA; Admin. R. M. 36.12.1706(2) ("applicant's plan may include the use of mitigation or aquifer recharge [] as a means of offsetting any adverse effect"). The applicant is tasked with proving adequate diversion,

---

[7] All citations to the Administrative Rules of Montana will be to the rules in effect as of February 11, 2016, the date the application was filed.

16

meaning that the requested water can be properly conveyed from the point of diversion to the place of use. Section 85-2-311(1)(c), MCA; Admin. R. M. 36.12.1707 (noting that this requires analysis of proposed flow rates and volume capacity and efficiency of the diversion, among other factors). The appropriation must be shown to be a beneficial use, which for present purposes includes agricultural operations. Sections 85-2-102(5)(a), -311(1)(d), MCA. Finally, applicants must prove they have a possessory interest in the place of use or the written consent of the person with the possessory interest in the property where the water is to be put to beneficial use. Section 85-2-311(1)(e), MCA.

*Application Process*

¶27 The first step taken by DNRC when it receives a water appropriation application is to evaluate whether the application is "correct and complete." Section 85-2-302(2), MCA.[8] Once deemed correct and complete, the application is analyzed by DNRC to determine whether the -311 criteria are satisfied. Admin. R. M. 36.12.1601(2). Unless waived, within 120 days DNRC "shall make a written preliminary determination as to whether or not the application satisfies the applicable criteria for issuance of a permit[.]" Section 85-2-307(2)(a)(ii), MCA.

---

[8] The term "correct and complete" is a term of art that means "that the information required to be submitted conforms to the standard of substantial credible information and that all of the necessary parts of the form requiring the information have been filled in with the required information for [DNRC] to begin evaluating the information." Section 85-2-102(9), MCA; *see* Admin. R. M. 36.12.1601. A determination that an application is correct and complete "does not mean that the permit will be granted; the applicant still must show by a preponderance of the evidence that the -311 criteria are met." *Flathead Lakers Inc. v. Mont. Dep't of Nat. Res. & Conservation*, 2020 MT 132, ¶ 18, 400 Mont. 170, 464 P.3d 396 (citing Admin. R. M. 36.12.1601(4)).

17

¶28 From there, the process depends on whether DNRC issues a preliminary determination to deny or a preliminary determination to grant the application. If DNRC issues a preliminary determination to deny, it "shall hold a [show cause] hearing pursuant to [§] 2-4-604[, MCA,] . . . for the applicant to show cause by a preponderance of the evidence as to why the permit or change in appropriation should not be denied." Section 85-2-310(1)(a), MCA; *see* § 2-4-604, MCA. A hearing examiner conducts the hearing and thereafter issues an order on behalf of DNRC, based on the evidence presented at the hearing. Section 2-4-604(1)(a), MCA; Admin. R. M. 36.12.203. Following entry of this final order, an applicant whose application remains denied may petition to the Water Court for judicial review. Section 2-4-702, MCA. Upon review, the Water Court may either affirm or reverse DNRC's order pursuant to § 2-4-701, et seq., MCA.

¶29 When a preliminary determination to grant is made, whether by DNRC administratively, after a hearing before an examiner, or after review by the Water Court, DNRC then prepares a notice containing all pertinent facts of the application, including a summary of the preliminary determination and any conditions, which is delivered to all parties whose water rights may be affected by the proposed application. Section 85-2-307(2)(d), MCA. Notice is also published in a newspaper of general circulation in the area of the source aquifer. Section 85-2-307(2)(b), MCA. Objections to the application may be filed by persons whose "property, water rights, or interests . . . would be adversely affected by the proposed appropriation." Section 85-2-308(3), MCA.

18

¶30    Upon the filing of valid objections, DNRC conducts a contested case hearing pursuant to § 2-4-601, et seq., MCA, on the objections. Section 85-2-309(1), MCA. The hearing is an opportunity for the objector(s), applicant, and DNRC to present evidence to the hearing examiner as to whether the permit should be granted or denied. Section 2-4-612(1), MCA. The hearing examiner then issues a final decision, which is ultimately again reviewable by the Water Court. Section 2-4-701, et seq., MCA.

¶31    Here, the Water Court reversed the preliminary determination and remanded the matter for "publication and notice of this decision," whereupon "potentially affected parties—including downstream water right owners—will be afforded an opportunity to submit objections demonstrating why they may be adversely affected by [DeBuff's] proposed appropriation."

¶32    We now turn to the rulings of the Water Court.

*1. DNRC reliance on information not in the Administrative Record*

¶33    The Water Court found error in DNRC's reliance on a geologic map and the 1987 Final Order, reasoning that because these articles of evidence were not part of the record, the decision of DNRC was reached by unlawful procedure. An agency's order must be vacated if founded on unlawful procedure that violates a party's due process interests. *Frasceli, Inc. v. Dep't of Revenue Liquor Div.*, 235 Mont. 152, 156, 766 P.2d 850, 852 (1988).

¶34    When determining legal availability, DNRC is to make its decision "based on the records of the [D]epartment and other evidence provided to the [D]epartment."

Section 85-2-311(1)(a)(ii), MCA. In construing statutes, "[i]t is axiomatic that the proper interpretation" first be determined according to the plain language. *Bean v. State Bd. of Labor Appeals*, 270 Mont. 253, 257, 891 P.2d 516, 519 (1995). Drawing from the clear wording of the statute, when determining legal availability of a source aquifer, DNRC may consider not only the evidence provided to it during the application process but also information within its records. Balancing this ability to review information beyond that presented by the parties is the requirement of due process, which mandates that applicants be put on notice that particular evidence may be used against them. *See Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 288 n.4, 95 S. Ct. 438, 443 n.4 (1974) ("the Due Process Clause forbids an agency to use evidence in a way that forecloses an opportunity to offer a contrary presentation") (citing *Ohio Bell Telephone Co. v. Public Utilities Comm'n*, 301 U.S. 292, 57 S. Ct. 724 (1937); *United States v. Abilene & S. R. Co.*, 265 U.S. 274, 44 S. Ct. 565 (1924)).

¶35 Regarding DNRC's use of the geologic map, the Water Court took issue with DNRC's rejection of Weight's conceptual model that concluded the aquifer was discontinuous, in favor of the position taken by DNRC staff that the aquifer was continuous based on the geologic map, without finding any fault with Weight's conclusions. Specifically, the Water Court reasoned that because the geologic map was not in the administrative record, any evidence drawn from it was inadmissible. Since DNRC relied heavily on the map in rejecting the utility of Weight's conclusions, the Water Court concluded no substantial evidence supported DNRC findings.

¶36 However, the geologic map was cited and endorsed by DeBuff and Weight throughout the process, and was well known to them. Any concern regarding the status of the map for purposes of the PD is alleviated by the fact that DeBuff was put on extensive actual notice it may be utilized and, rather than objecting to it, elected instead to incorporate it within DeBuff's own memoranda and reports. Therefore, without regard to the strength of DNRC's determinations premised upon the map, we conclude the Water Court erred by ruling that DNRC erred by using the map. Due process was provided to DeBuff and DNRC was permitted to consider the geologic map pursuant to § 85-2-311(1)(a)(ii), MCA.

¶37 DNRC also relied upon statements in the 1987 Final Order for its legal availability analysis, which the Water Court likewise held was a procedural error. The 1987 Final Order involved the same source aquifer, concerned the same senior appropriators, and was issued in regard to the same applicant, DeBuff. It seems obvious the 1987 Order would be included within the "records of the [D]epartment" under § 85-2-311(1)(a)(ii), MCA, and, because it was very closely related to the circumstances of the current application, was relevant and appropriate. It also was subject to rebuttal, as anticipated by the then-dismissal of DeBuff's claim without prejudice. Further, as a prior decision, the 1987 Order could be considered a "judicially cognizable fact[,]" allowing for *sua sponte* notice and recognition of the facts therein. *See* Admin. R. M. 36.12.221(4) (requiring notice to parties that facts have been recognized "either before or during the hearing or by reference in the proposal for decision"). As evidenced by DeBuff's inclusion of the 1987 Final Order as evidence in its presentation at the show cause hearing, DeBuff was on notice about its

21

inclusion and due process was provided. We therefore conclude DNRC's reliance on the 1987 Final Order was not improper.

*2. Source Aquifer Continuity*

¶38 Our determination that DNRC properly relied upon both the geologic map and the 1987 Final Order alters the review of the sufficiency of the evidence supporting the agency's aquifer continuity determination. With the inclusion of that evidence, we must conclude the Water Court erred by holding that DNRC's determination was not supported by substantial evidence, especially in light of the requirement that "evidence is viewed in the light most favorable to the prevailing party when determining whether findings are supported by substantial credible evidence." *Blaine Cnty. v. Stricker*, 2017 MT 80, ¶ 26, 387 Mont. 202, 394 P.3d 159 (citing *Welu v. Twin Hearts Smiling Horses, Inc.*, 2016 MT 347, ¶ 12, 386 Mont. 98, 386 P.3d 937). As the Water Court correctly acknowledged, the preponderance of the evidence standard is "relatively modest." *Hohenlohe v. State*, 2010 MT 203, ¶ 33, 357 Mont. 438, 240 P.3d 628.

¶39 However, that is not to say there remains no doubt about DNRC's finding and, as explained above, the standards of review permit a broader judicial inquiry. Upon initial review of DeBuff's original 2016 application, DNRC took the position that the source aquifer was hydrologically connected to Living Springs. Seven months after issuing the first "correct and complete" letter, and upon receipt of Weight's evidence and analysis of discontinuity, DNRC altered its position and, as noted by the Water Court, "shifted the focus [and] imposed a new burden on [DeBuff] to prove the source aquifer is not connected

22

to the southern springs." DeBuff engaged in extensive pump testing upon the protocol that DNRC approved and showed that no drawdown occurred, effectively demonstrating, in the Water Court's words, "the requisite lack of aquifer connection[.]" DNRC ultimately rejected this determination based upon the 1987 Final Order and its assessment of the geologic map, but did so without identifying deficiencies in Weight's analysis or otherwise explaining why it was rejecting the analysis, other than to say it favored conclusions drawn from the map. While it remained DeBuff's burden to disprove DNRC's map analysis, rather than DNRC's burden to disprove Weight's analysis, the evidence produced by DeBuff was extensive, and required at a minimum an explanation by DNRC for its rejection of the evidence. *See Mont. Envtl. Info. Ctr.*, ¶ 97 (an agency must "cogently explain why it has exercised its discretion in a given manner") (internal citation and quotation omitted)). While the procedural posture of this case does not require that we decide the factual issue of continuity in this appeal, suffice it to say, given the Department's handling of the issue, that "a review of the record leaves the court" with serious questions that may be addressed during further proceedings. *Schmidt*, ¶ 21.

*3. Failure to Acknowledge Evapotranspiration Analysis*

¶40 The Water Court took issue with DNRC's failure to address the evapotranspiration analysis provided by DeBuff, and its rejection thereof. The court determined that, by not analyzing the evapotranspiration evidence in the Final Order, combined with DNRC's determination that the water was physically available, "DNRC failed to cogently explain why [DeBuff] did not prove the amended application eliminated net depletion to water

23

available to downstream water rights." The Water Court characterized the lack of consideration as an arbitrary and capricious error of law.

¶41 A decision is arbitrary and capricious "if it appears, based on the existing record, to be random, unreasonable, or seemingly unmotivated." *Cmty. Ass'n for N. Shore Conservation, Inc. v. Flathead Cnty.*, 2019 MT 147, ¶ 28, 396 Mont. 194, 445 P.3d 1195 (citing *Kiely Constr. LLC v. City of Red Lodge*, 2002 MT 241, ¶ 69, 312 Mont. 52, 57 P.3d 836). This can manifest through failure to consider all relevant factors or by basing a decision on clearly erroneous judgment. *Bitterrooters for Planning, Inc. v. Mont. Dep't of Envtl. Quality*, 2017 MT 222, ¶ 16, 388 Mont. 453, 401 P.3d 712 (citation omitted). However, the arbitrary and capricious standard "does not permit reversal 'merely because the record contains inconsistent evidence or evidence which might support a different result.'" *Bitterrooters for Planning, Inc.*, ¶ 16 (quoting *Montana Wildlife Fed. v. Mont. Bd. of Oil & Gas Conserv.*, 2012 MT 128, ¶ 25, 365 Mont. 232, 280 P.3d 877).

¶42 It gives us pause that DNRC ostensibly endorsed DeBuff's evapotranspiration analysis, and evapotranspiration analysis in general, only to completely reverse its position in the PD and offer no explanation for doing so—even though DeBuff raised the issue in writing and asked for reconsideration after DNRC issued its third revised technical report. In its January 23, 2018 memorandum responding to Weight's water budget proposal that incorporated analysis of evapotranspiration, DNRC expressed some concern over the mechanics of the water budget and evapotranspiration analysis, but did not reject them altogether and, indeed, provided its own analysis that an estimated 230.8 acre-feet would

24

become available by evapotranspiration savings at Living Springs—a clear endorsement of use of the methodology for this application. DNRC's analysis was even more favorable to DeBuff than Weight's and, following further consultation with DNRC, DeBuff submitted an amended application that significantly reduced the proposed use from 552.69 to 216.4 acre-feet, bringing the proposal to zero net depletion, that is, to less than what was already being lost to evapotranspiration. However, DNRC then reversed its position regarding evapotranspiration in the PD, without explanation.

¶43 DNRC first argues that evapotranspiration analysis was not included in the amended application. However, there is no avoiding the substantial importance that evapotranspiration had on the application—the amended application with significantly reduced volume was submitted because of it. Both DeBuff and DNRC actively conducted evapotranspiration analyses and, for purposes of a PD, DNRC may consider all information provided to it and must address any relevant evidence. Section 85-2-311(1)(a)(ii), MCA; *Clark Fork Coal.*, ¶ 21. DNRC argues the absence of findings in the Final Order related to evapotranspiration analysis was harmless error because it had no impact on the outcome of the decision, citing the testimony of Folnagy at the show cause hearing that evapotranspiration analysis did not credibly demonstrate it would lead to the desired outcome in this circumstance. Given the significant role evapotranspiration analysis played in the proceeding, as well as DNRC's obligation to "cogently explain why it has exercised its discretion in a given matter[,]" *Mont. Envtl. Info. Ctr.*, ¶ 97, we cannot conclude the failure to address it was harmless, or that Folgany's post hoc testimony was

sufficient to justify its rejection. Up until issuance of the PD, the parties engaged the process upon the premise that evapotranspiration analysis was a valid and key element of the proposal.

¶44 We conclude the Water Court correctly determined that the agency's action was arbitrary and capricious. Review of the record in its entirety, including that discussed above regarding the continuity issue, leaves, at a minimum, an impression that as DeBuff worked to satisfy DNRC's concerns, DNRC kept moving the goalposts, without an adequate explanation.

*4. Legal Availability and Adverse Effect*

¶45 The Water Court's reversal of DNRC's findings, and our determinations herein, significantly impact the issues of legal availability and adverse effect. Without a sufficient basis for DNRC to reject the extensive evidence, some from DNRC itself, which demonstrated the amended application resulted in zero net depletion, including by evapotranspiration analysis and by mitigation provided by application of two of DeBuff's existing water rights, the record would indicate, at this stage of the proceeding, that the proposed use does not reduce the amount of water available for senior appropriators, physically or legally. In *Baker Ditch Co. v. Dist. Court*, 251 Mont. 251, 256, 824 P.2d 260, 263 (1992), we noted that a subsequent appropriator has the right to the use of water if such use "cannot in any way be a detriment to a prior appropriator[.]" Consistent therewith, § 85-2-401(1), MCA, provides that "[p]riority of appropriation does not include the right to prevent changes by later appropriators in the condition of water occurrence, such as the

26

increase or decrease of streamflow or the lowering of a water table, artesian pressure, or water level, if the prior appropriator can reasonably exercise the water right under the changed conditions." The record here clearly establishes that the amended application, including the evidence that DNRC rejected without a proper basis, satisfies the statutory criteria for a preliminary determination and may move forward to face objections, if any, by other appropriators in the process explained above and provided for in § 85-2-307, et. seq., MCA.

¶46　Reversed in part, affirmed in part, and remanded to the Department for further proceedings consistent herewith.

/S/ JIM RICE

We concur:

/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ DIRK M. SANDEFUR